# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LARRY D. LINCOLN and
BRAD C. MOSBRUCKER,

       Plaintiffs,

v.

BNSF RAILWAY COMPANY,

       Defendant.

Case No. 15-cv-4936-DDC-KGS

## MEMORANDUM AND ORDER

This matter comes before the court on defendant BNSF Railway Company's Motions for Summary Judgment against plaintiffs Larry Lincoln and Brad Mosbrucker (Docs. 58, 60).  BNSF moves separately for summary judgment against each plaintiff.  The court rules both motions in this consolidated order because plaintiffs assert the same three claims arising from related events:  (1) disability discrimination and failure to accommodate under the Americans with Disabilities Act ("ADA"), (2) retaliation under the ADA, and (3) retaliation for activity protected by the Federal Railway Safety Act ("FRSA").  For reasons explained below, the court grants BNSF's Motions and enters summary judgment against both plaintiffs.

## I.      LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  A disputed "issue of fact is 'genuine' 'if the evidence is such

1

that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an "issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party meets its initial burden, the non-moving party "'may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id*. (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.

To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## II.    UNCONTROVERTED FACTS

The following facts either are uncontroverted or, where controverted, they are stated in the light most favorable to plaintiffs as the non-moving parties.

### A.  The Chemical Spill

Both plaintiffs were working as Maintenance of Way ("MOW") workers for BNSF when, on Tuesday, October 9, 2007, a tank car began to leak, exposing plaintiffs to a hazardous chemical. Plaintiffs were rushed to the emergency room where both were treated and released later the same day. Plaintiffs returned to work without any work restrictions six days later.

### B.  The Demand Letter

Two and a half years after the chemical spill, BNSF offered plaintiffs a settlement for their injuries from the 2007 chemical spill, but the parties were unable to reach an agreement. Plaintiffs' lawyer, Jared Woodfill, then sent demand letters to BNSF's claim representative, Alan Bladsel. The letters described each plaintiff's injuries in detail. The letter sent on Mr. Lincoln's behalf claimed he suffered regular headaches, bloody noses, colds, respiratory infections, and anxiety attacks. The letter sent for Mr. Mosbrucker described his condition to include visual, pulmonary, and emotional/psychiatric problems.

### C.  Plaintiffs' Medical Leave

Someone at BNSF forwarded Mr. Lincoln's demand letter to Natalie Jones, the Medical and Environmental Health ("MEH") Department Field Manager for BNSF's Kansas division. It is unclear whether Mr. Mosbrucker's demand letter was forwarded as well but, regardless, Ms.

Jones learned about both demand letters.  In her role as Field Manager, Ms. Jones consulted with Dr. Sharon Clark, a Field Medical Officer for BNSF's medical department, to determine whether plaintiffs should continue working.  In May 2010, Dr. Clark determined that BNSF should place both plaintiffs on a medical leave of absence.  As a result, plaintiffs were removed from their positions.  Dr. Clark explained her decision about Mr. Lincoln in an email she sent to Mr. Blasdel:

> As per our conversation today, based on the information in [Mr. Woodfill's] letter, I don't see any other avenue than to ask the employee for updated medical information to either support or deny [Mr. Woodfill's] claims regarding current functionality.

Doc. 73-15 at 1.  Dr. Clark went on to explain that the medical information Ms. Jones had for Mr. Lincoln was more than a year old, and that Mr. Lincoln needed "to provide updated medical information to clarify the newly raised safety issues [presented in the demand letter] despite the employee's verbal claims . . . that he can do his job." *Id.* at 1.

On May 21, 2010, Division Engineer Darin Martin sent each plaintiff a letter informing the two men they would be placed on a medical leave of absence lasting from May 27, 2010 to June 27, 2010.  The letter stated in part:

> Whereas, you have worked successfully for 2 ½ years since the alleged injury, we find it unfortunate to have to request that you provide current medical information to our Medical Department to support that you are indeed safe to work as a [MOW] Machine Operator.
>
> You may not even be aware that your attorney has placed this burden on you, and we hope that you will contact our Medical Field Manager, Natalie Jones, to quickly resolve this issue, so that you can return to providing financially for your family.
>
> Since the BNSF Railway is essentially placed on notice by the letter, we do not want to give you job assignments that would jeopardize your health and safety.

4

> The Medical and Environmental Health Department determines fitness of duty of BNSF employees by reviewing their medical information. You will be placed on a thirty day medical leave of absence.

Doc. 59-12 at 1; *see also* Doc. 61-13 at 1. The letters also asked each plaintiff to have his treating physician fax Ms. Jones: (1) the diagnosis of the conditions for which he was being treated, (2) the treatment plan or treatment being received, (3) an estimate of how long treatment would continue, and (4) information about their functional level and restrictions. Doc. 59-12 at 1; *see also* Doc. 61-13 at 1.

Subsequent letters informed plaintiffs that BNSF had extended their medical leave. Each such letter included a medical leave form that instructed plaintiffs to read all of the information carefully. The forms also instructed each plaintiff "to work with [his] Field Manager or [the] Medical and Environmental Health (MEH) Department" while he was off duty. Doc. 59-30 at 2; Doc. 61-57 at 2. These subsequent letters also advised that plaintiffs would need to be "released by the medical department prior to returning to work." Doc. 59-30 at 2; Doc. 61-57 at 2.

On July 13, 2010, Dr. Clark sent another email to certain BNSF personnel, including Darin Martin, Natalie Jones, and Mr. Bladsel. It read:

> The employee did indeed miss only 3 days of work back in 2007 after a claimed exposure incident. He did work full duty until his attorney, a Mr. Jared Woodfill, forwarded a . . . letter to BNSF['s] claims Department noting that Mr. Lincoln has suffered permanent injuries/illness due to the 2007 incident and demanded a considerable sum of money.

> The conditions noted in the attorney's letter were such that Mr. Lincoln's ability to work safely was brought into question.

> Due to this concern, it was decided that the employee should not be allowed to remain at work until he provided updated information regarding his medical conditions.

> Please note that the impetus behind this removal from service action is the letter from the employee's voluntarily-selected legal representative.
>
> To date, Mr. Lincoln has provided some medical information requested of him. He is in the process of providing the remainder of the information. To date, for the conditions for which the employee has provided information, the employee does appear to be able to perform his job duties.
>
> . . .
>
> The employee has put himself into this situation.
>
> On one hand he is claiming that he has significant physical ailments (which cause symptoms of safety concern) from an incident in 2007—in order to garner money from BNSF claims.
>
> On the other hand he is complaining that he was wrongfully removed from service. He has been slow in providing the evidence to support his current physical status (which brings into question the attorney's claims of current illnesses) . . . .

Doc. 73-16 at 1.

### D. BNSF's Return to Work Process

BNSF's MEH Department works with employees to determine their "fitness for duty" in order to return to work after being removed. The employee usually initiates this "return to work" process by submitting medical information to the MEH Department. As long as the employee's medical information indicates that the employee is fit to perform the requirements of his job, the employee is released to work. Doc. 59-6 at 3. The employee's fitness for duty review is triggered when the employee provides documentation from his treating physician that clears him to return to work. *Id.*

BNSF's MEH department addresses an employee's return to work in the following fashion. If the employee's physician releases him to work but the employee's evaluation precludes him from doing his assigned job, MEH will examine whether there is another job that

the employee can perform that fits the physician's work recommendations. But, if the physician does not release the employee to work, MEH will discuss a craft transfer with the employee.

BNSF's craft transfer policy allows employees who are represented by a collective bargaining agreement to transfer from one craft to another craft within BNSF's work force. But, "[e]mployees must be eligible and meet all of the requirements for a craft transfer in order to transfer to another craft." Doc. 74-37 at 1. General eligibility requirements for an employee to transfer crafts include: (1) applying through BNSF's career website for the position to which the employee wishes to transfer; (2) meeting the basic qualifications for the position as indicated by the job posting; and (3) meeting the guidelines of the supervisor/record review. *Id.* at 2. Also, an employee seeking a craft transfer must follow the internal selection process. *Id.* This process includes participating in an interview with Human Resources and the hiring manager. *Id.*

MEH also looks outside BNSF for positions that the employee may be qualified to perform. MEH will work with the employee to develop a resume, provide leads, or assist the employee with education.

### E. Plaintiffs' Return to Work Experience

After BNSF placed plaintiffs on medical leave, they began working with the MEH Department to try to return to work. Ms. Jones testified that plaintiffs communicated well with her over the course of their interactions. After Ms. Jones's departure from BNSF, plaintiffs worked with others in the MEH department including Laurie Graham and Chris McGinnis. These interactions occurred over several years, and the following timeline summarizes them.

## 1. Mr. Lincoln

### 2010

- On June 24, 2010, Ms. Jones documented that Mr. Lincoln had a medical appointment in July and would submit a final report about his medical conditions afterwards.

- Later, in July, a case note documented that Ms. Jones had sent both plaintiffs job postings about available clerk positions.

- In August, Mr. Lincoln was diagnosed with reactive airway dysfunction system (RADS). Nurse practitioner Melissa West provided a report from August 2010 stating that Mr. Lincoln was suffering from residual complications from his 2007 chemical exposure. These complications included: (1) allergic rhinitis; (2) epistaxis; (3) dyspnea on exertion; (4) wheezing; (5) headaches; (6) insomnia; (7) anxiety; and (8) fatigue. This report also asserted that Mr. Lincoln should be restricted to indoor employment.

- In September, Ms. Jones sent Mr. Lincoln a letter to confirm some of their conversations. Specifically, Ms. Jones sought Mr. Lincoln's pulmonary function test report. Ms. Jones's letter also included study materials for Mr. Lincoln to take the First Line Supervisor test.

- Later in September, Ms. Jones emailed Mr. Lincoln with information about an available welder position and confirmed that she would administer the FLS test to Mr. Lincoln. He passed the test.

- Ms. Jones informed Mr. Lincoln that "[p]lacement as an eligible FLS candidate is extremely likely due to the expected high number of retirements." Doc. 73-29 at 7.

### 2011

- A supplemental doctor's note from Mr. Lincoln's physician dated February 7 or 9, 2011, stated: (1) Mr. Lincoln still had chronic rhinitis and epistaxis; (2) outdoor exposure triggered worsening of his symptoms; (3) Mr. Lincoln was not able to return to work; and (4) the estimated date of return to work was still indefinite for outdoor employment.

- On June 14, 2011, Mr. Lincoln's nurse practitioner certified that Mr. Lincoln had been disabled from performing his regular occupation as of July 2010 with an undetermined end date. Also, the letter certified that Mr. Lincoln was permanently disabled from his regular occupation with commentary that "outdoor exposures trigger worsening rhinitis symptoms." Doc. 59-18 at 1.

- At a deposition taken during 2011, Mr. Lincoln testified that he suffered from migraines and, because of his RADS diagnosis, from shortness of breath. He testified that he was miserable when he was outdoors, and that he could not return comfortably to his job as a welder.

- Ms. Jones wrote to Mr. Lincoln on July 28, 2011, encouraging him to apply for additional upcoming clerk jobs. In the letter, Ms. Jones told Mr. Lincoln that a "college degree will be a plus" as would Microsoft Office skills and typing 25 WPM. Doc. 59-13 at 10. The letter did not mention any other requirements for the clerk positions.

- MEH agreed to send Mr. Lincoln to Washburn Institute of Technology in Topeka to take a class so he could pass the WPM typing requirement for the clerk positions and develop additional PC and Windows skills. He completed the class and received a certificate. Mr. Lincoln believed that if he passed the typing test, he would be given a clerk position.

- Mr. McGinnis took over for Ms. Jones as Field Manager for BNSF's MEH Department. In August, he authorized BNSF to pay for a custom class for Mr. Lincoln.

- Mr. McGinnis offered Mr. Lincoln assistance in getting back to work. This discussion included his MOW job, or going to college and finding another position.

## 2012

- Laurie Graham introduced herself to Mr. Lincoln as the new BNSF MEH field manager in a letter dated February 3, 2012. The letter advised:

  > According to your file, I see that we have not heard from you in quite a while. I see that you were completing keyboarding and possibly other courses. I would welcome the opportunity to speak with you regarding this training and your current medical status. My goal is to assist you with returning to gainful employment.

  > Doc. 59-13 at 20.

- Ms. Graham entered a case note on September 6, 2012, that documented a conversation with Mr. Lincoln. The note stated the following: (1) Mr. Lincoln advised that he had passed a 26 word-per-minute typing exam; (2) Ms. Graham discussed alternate internal jobs; (3) Mr. Lincoln reported that he thought he could work in a shop environment, but that his doctor identified chemicals as the

irritant in the shops; (4) Ms. Graham confirmed that Mr. Lincoln had three and a half years of college.

- On October 1, Ms. Graham sent Mr. Lincoln a letter. It stated:

> I have spent some time researching opportunities within BNSF since our last conversation and am writing to let you know what steps need to be taken to get you to a competitive level.
>
> With your restrictions of needing an "inside environment" as well as your completion of 3½ years of college, applying for a clerk position would be the most reasonable approach. You are currently typing at 26 net wpm which is barely above the 25 net wpm minimum requirement. Definitely practice at home to increase this skill.
>
> We discussed the fact that the applicant pool for these clerk positions are highly competitive with many applicants having advanced degrees in accounting and/or finance. Completing your degree as well as taking classes in accounting or finance would make you more competitive. We would be willing to pay for two quarters of college credits to assist you with this plan.
>
> In regards to your applications for a Mechanical position, since these positions require 75% of outside work, you are significantly limited in being selected for one of these positions. I would suggest that you work with your physician to identify a respirator that we would be willing to provide to use not only in the mechanical shop environment but also outside.
>
> I would also recommend that you take advantage of vocational services for skill enhancement, interviewing skills, and resume development to help you in securing employment outside BNSF. I can be reached at the number above should you decide to pursue any of these options.
>
> Doc. 59-20 at 1.

- On October 1, Mr. Lincoln sent Darin Martin a letter with the reference line "Notice of Request for Accommodation." Doc. 59-19. In the letter, Mr. Lincoln formally requested that BNSF enter the interactive process of evaluating jobs to find those that fit his qualifications and restrictions, or ask if BNSF could reasonably accommodate to fit his restrictions. *See id.* He specifically requested that BNSF search for non-MOW placement at BNSF in addition to considering MOW placement. *Id.*

- On December 4, 2012, Mr. Lincoln sent a letter to Jeanne Artzer enclosing an "employee request for accommodation" form. Doc. 59-21. Part of the form required a physician's signature, but Mr. Lincoln never got a doctor to sign it. This letter included an attachment describing the accommodations that Mr. Lincoln sought. The accommodations he sought asked to "keep outdoor work as infrequent and brief as possible to limit exposure to allergens and toxins." *Id.* at 2.

- BNSF never informed Mr. Lincoln that he had filled out the Request for Accommodation form incorrectly.

## 2. Mr. Mosbrucker

### 2010

- On June 23, 2010, Mr. Mosbrucker provided BNSF with a "Statement of Sickness" form signed by his nurse practitioner. The form stated that: (1) Mr. Mosbrucker had been evaluated for chemical exposure; (2) he had been referred to a pulmonologist; (3) he started medication for anxiety on June 23, 2010; (4) he was expected to be seen again on July 14, 2010; (5) his current condition included "Anxiety—probable PTSD, need further psychiatric evaluation;" and (6) a return to work date of "2011 (unknown)." Doc. 61-15 at 2.

- Ms. Jones recommended that Mr. Mosbrucker apply for positions even if he lacked the basic qualifications for them so that he might gain experience from applying and interviewing. Ms. Jones also recommended to Mr. Mosbrucker that he take courses to enhance his skills.

- On July 1, 2010, Ms. Jones documented that Mr. Mosbrucker had informed her that his doctor was taking him off work until 2011 without any known return to work date.

- On July 29, 2010, Ms. Jones sent Mr. Mosbrucker a letter informing him of postings for clerk positions. It stated: "[p]lease note there is on the job training, and the lifting requirement may be accommodated by breaking down to smaller lifting loads." Doc. 74-33 at 4.

- Mr. Mosbrucker's nurse practitioner sent a disability letter to Ms. Jones stating that it was undetermined whether Mr. Mosbrucker was permanently disabled, but that his estimated return to work date was "pending psychiatric evaluation." Doc. 61-15 at 3.

- Around September 1, 2012, Ms. Jones sent Mr. Mosbrucker a letter reminding him that he could continue to apply for any craft transfer positions that BNSF posted. She also informed Mr. Mosbrucker that her program would pay for refresher courses for different crafts.

- Mr. Mosbrucker's nurse practitioner sent BNSF a letter in mid-September. It stated: "Mr. Mosbruck[er] is suffering from many residual complications since [his 2007 chemical exposure] including headaches, dyspnea on exertion, chest pain, anxiety, insomnia and fatigue." Doc. 61-16 at 1. It also stated that Mr. Mosbrucker "should be restricted to employment indoors." *Id.*

- In late October, Ms. Jones sent Mr. Mosbrucker another letter. In it, Ms. Jones reminded Mr. Mosbrucker that BNSF employees have the opportunity to seek modifications and accommodations in their craft, and that she hoped he could resume his MOW position. The letter also reminded Mr. Mosbrucker that job postings change daily, and that he should check for opportunities a couple of times per week. Doc. 61-15 at 20. It also informed Mr. Mosbrucker that the First Line Supervisor test offers exempt employment opportunities with BNSF, and offered to administer the test at his convenience in Topeka. *Id.* Finally, Ms. Jones' letter offered to help cover the cost of tuition and books for Mr. Mosbrucker to complete a functional program at the local community college. *Id.*

- Ms. Jones administered the First Line Supervisor test to Mr. Mosbrucker. He did not pass it.

- Ms. Jones sent Mr. Mosbrucker another letter on November 30, 2010, reminding Mr. Mosbrucker about the upcoming enrollment for the spring semester. She also offered to assist with tuition and books. Doc. 61-15 at 23.

- In December, Mr. Mosbrucker's nurse practitioner signed a supplemental doctor's statement about him. This statement provided an estimated return to work date of May 1, 2011, and reiterated that Mr. Mosbrucker was unable to work outdoors in proximity to moving trains.

- BNSF has not completed a fitness for duty review for Mr. Mosbrucker since 2010 because he has never provided BNSF with documentation suggesting that he was able to return to work.

## 2011

- In January 2011, Ms. Jones sent Mr. Mosbrucker another letter. This letter asked about his interest in introductory computer classes such as Microsoft Office to advance his skills. The letter also informed him that BNSF could assist him through four semesters of vocational or community college. Doc. 61-15 at 24.

- In late January, Ms. Jones wrote a letter to Mr. Mosbrucker's nurse practitioner requesting an update about his medical condition. His nurse practitioner Mansfield responded, affirming that Mr. Mosbrucker was restricted to indoor employment to prevent worsening of his condition.

- In May, Ms. Jones sent another letter to Mr. Mosbrucker requesting his medical records from his pulmonologist and psychiatrist so that she could make a fitness for duty recommendation. Mr. Mosbrucker does not recall making any efforts to secure these records.

- In July, Ms. Jones sent Mr. Mosbrucker a letter advising him about future clerk positions that required him to type 25 words per minute.

- Mr. McGinnis sent a letter to Mr. Mosbrucker introducing himself and asking for his medical records. Mr. McGinnis's letter included his phone number, fax number, and email address, but Mr. Mosbrucker never faxed or emailed any medical records or spoke to Mr. McGinnis. Mr. McGinnis also informed Mr. Mosbrucker of some clerk positions with BNSF. Doc. 61-15 at 33.

- Mr. McGinnis authorized BNSF to pay for a custom skill class for Mr. Mosbrucker. Mr. Mosbrucker earned a certificate for PC and Windows keyboard training.

- In 2011, Mr. Mosbrucker testified at a deposition that he could no longer do his job for fear of working in close quarters with trains. He also testified that he had been told by his doctors that he could not work outdoors.

## 2012

- Laurie Graham replaced Mr. McGinnis in 2012. Ms. Graham sent Mr. Mosbrucker a letter informing him that it was her goal to assist him in returning to work. Doc. 61-15 at 38.

- Ms. Graham's case notes from August 9, 2012, state that she offered Mr. Mosbrucker free external vocational services to assist with resume development and training and external job placement. The notes state that he had refused these services. Ms. Graham informed Mr. Mosbrucker that when candidates apply for jobs with BNSF, BNSF selects the best candidate.

- Ms. Graham sent Mr. Mosbrucker a letter dated October 1, 2012. It stated that she had reviewed reasonable options for Mr. Mosbrucker to return to work based on future openings at BNSF, his skills, and his physical restrictions. Doc. 61-15 at 41. She informed him that the jobs he had applied for required him to have passed either the Mechanical Aptitude Test or First Line Supervisor ("FLS") Test, which he had not done, or that he be able to work outdoors around trains and heavy equipment. *Id.* She also suggested that he: (1) retake the Mechanical Aptitude Test; (2) enroll in a Microsoft Office class; or (3) broaden his employment search outside BNSF. *Id.*

- During this time, Mr. Mosbrucker was still restricted from working outdoors. He also suffered from a fear of trains when they were moving at 70 mph speeds.

- In October, Ms. Graham entered a case note documenting that Mr. Lincoln and Mr. Mosbrucker had called her in a conference call to vent about their frustrations (*i.e.,* how they were not getting interviews, taking tests, and not getting craft transfers). Her notes confirmed that neither plaintiff wanted an outside job, that she had received their ADA letters, and that she would forward them to the appropriate people for handling.

- Mr. Mosbrucker wrote Ms. Artzer a letter and attached an "employee request for accommodation form." Part of the form required a Health Professional's signature. No physician signed Mr. Mosbrucker's form. Doc. 61-24 at 4.

- Ms. Artzer testified that when a prospective BNSF employee requests an accommodation of a health condition, before the interactive process can begin, the employee must fill out a "Request for Accommodation" form, and also must have a doctor fill out a "Healthcare Provider's Certification." BNSF does not pay doctors to fill out the certification; the employee must pay for it.

- Mr. Mosbrucker lost his health insurance in January 2012, and remained uninsured in the years that followed. As a result, Mr. Mosbrucker filled out the healthcare forms, but he did not have a healthcare provider sign it.

- On November 5, 2012, a month after Mr. Mosbrucker sent his formal request for accommodation, BNSF changed Mr. Mosbrucker's internal employment status from vocational rehabilitation to "estoppel status."

### F. Applications

Both plaintiffs applied for a number of BNSF jobs. The next two sections discuss them.

## 1. Mr. Lincoln

Mr. Lincoln applied for 21 jobs at BNSF. The court has discussed just some of his applications because, as discussed later in the order, he only exhausted his administrative remedies for some of his ADA and FRSA claims. Some of the jobs discussed below pertain to Mr. Lincoln's ADA claims, and others pertain only to his FRSA claims. For efficiency, the court groups them together and discusses all of the relevant applications here:[1]

- **General Clerk-Administrative (applied August 1, 2012):** BNSF's job posting for the General Clerk-Administrative position listed the requirements for the position. These requirements included: (1) taking and passing a typing test, (2) ability to type 25 WPM, 35 WPM preferred, (3) minimum of one year of verifiable training and/or work experience in an administrative function within an office environment, and (4) basic level skills in Microsoft Office Suite. Doc. 59-33 at 2–3. Mr. Lincoln never had held a job doing clerical or accounting work, but he had performed some administrative functions at past jobs on an as needed basis. This included answering phones, entering information into computers, and other similar duties. The job posting provided, "Company paid on the job training is provided." Doc. 59-33 at 3.

- **Pipefitter (applied August 1, 2012 and November 1, 2012):** BNSF's job posting for the Pipefitter position listed the requirements for the position. They included the employee is "able to work outdoors in all weather conditions." Doc. 59-36 at 2.

- **Clerk-Revenue Management (applied August 29, 2012):** The basic requirements for the Clerk-Revenue Manager positon included one year minimum customer service experience and one year clerical experience.

- **Carman (applied September 26, 2012 and November 1, 2012):** BNSF's job posting for the Carman position listed the requirements for the position. These requirements included one providing that the employee is "able to work outdoors in extreme all weather conditions (hot, cold, rain, snow, and sleet)." Doc. 59-35 at 2.

- **Mechanical Shop Laborer (applied July 19, 2012 and November 1, 2012):** BNSF's job posting for the Mechanical Shop Laborer position listed the requirements for the position. They included that the employee is "able to

---

[1] The parties do not specify the dates when BNSF announced the decisions not to hire plaintiffs for the positions. Instead, it appears that the parties used the dates of their applications to determine which claims plaintiffs had exhausted their administrative remedies. The court adopts their convention in this order.

work outdoors in extreme all weather conditions (hot, cold, rain, snow, and sleet)." Doc. 59-34 at 2.

- **Safety Assistant Position (appointed July 2014):** Mr. Lincoln sent Gary Marquart, the Union General Chairman, a letter expressing interest in this position. Mr. Marquart appointed Mr. Lincoln to the position on July 7, 2014. But, BNSF representatives within the Manpower, Engineering and Labor Relations departments informed Mr. Marquart that Mr. Lincoln could not be appointed to the position. Appointment to the Safety Assistant position requires that the employee is fit for duty in the craft, including the ability to work outdoors in all weather conditions (hot, cold, rain, snow, and sleet). Lance Lincoln, Mr. Lincoln's brother, was appointed to the position instead. Later, Lance Lincoln signed a Declaration stating that he rarely worked outside in this position.

### 2. Mr. Mosbrucker

Mr. Mosbrucker applied for 22 jobs at BNSF. The court has discussed just some of his applications because, as with Mr. Lincoln, he only exhausted his administrative remedies for some of his ADA and FRSA claims. Some of the jobs discussed below pertain to Mr. Mosbrucker's ADA claims, and others pertain only to his FRSA claims. As with Mr. Lincoln, the court groups them together and discusses all of Mr. Mosbrucker's relevant applications here:

- **Mechanical Shop Laborer (applied July 17, 2012 and November 24, 2014):** BNSF's job posting for the Mechanical Shop Laborer position listed the requirements for the position. They included that the employee is "[a]ble to work outdoors in all weather conditions (hot, cold, rain, snow, and sleet)." *See, e.g.,* Doc. 61-41 at 2.

- **General Clerk-Administrative (applied July 31, 2012):** BNSF's job posting for the General Clerk-Administrative position listed the requirements for the position. They included: (1) taking and passing a typing test; (2) ability to type 25 WPM, 35 WPM preferred; (3) minimum of one year of verifiable training and/or work experience in an administrative function within an office environment; and (4) basic level skills in Microsoft Office Suite. Doc. 61-35 at 2–3. The job posting provided, "Company paid on the job training is provided." *Id.* at 3.

- **Pipefitter (applied July 31, 2012):** BNSF's job posting for the Pipefitter position listed the requirements for the position. They included that the

employee is "[a]ble to work outdoors in all weather conditions (hot, cold, rain, snow, and sleet)." Doc. 61-36 at 2.

- **Carman (applied July 31, 2012):** Ms. Artzer testified in her deposition that Mr. Mosbrucker met the minimum qualifications to fill the Carman position as long as he could work outdoors. Doc. 61-4 at 6–7.

- **Senior Analyst for Payroll Production (applied July 31, 2012):** BNSF's job posting for the Senior Analyst for Payroll Production listed the requirements for the position. These requirements included that the employee had "a solid understanding of payroll and a working knowledge of SAP." Doc. 61-45 at 2.

- **Technology Services Management Trainee (applied October 10, 2014):** BNSF's job posting for the Technology Services Management Trainee position listed the qualifications for the position. These qualifications included a GPA of 2.75 or above for engineering majors or 3.0 or above for non-engineering majors. Doc. 61-41 at 2.

- **Mechanic Diesel Engine (applied November 5, 2014):** BNSF's job posting for the Mechanic Diesel Engine position listed the requirements for the position. These requirements included that the employee is "[a]ble to work outdoors in all weather conditions." Doc. 61-51 at 1.

- **Electrician Diesel Engine (applied November 26, 2014):** BNSF's job posting for the Electrician Diesel Engine position listed the requirements for the position. These requirements included that the employee is "[a]ble to work outdoors in all weather conditions." Doc. 61-54 at 1.

The jobs that the two plaintiffs sought fall into two categories: clerk positions and shop positions. The clerk positions that they sought included the General Clerk-Administrative, Clerk Revenue Manager, Senior Analyst for Payroll Production, and Technology Services Management Trainee positions. The shop positions that they sought included the Mechanical Shop Laborer, Boilermaker, Carman, Safety Assistant, and Pipefitter positions. While most shop positions are performed primarily in a location called "Building 12," part of BNSF's Topeka shops, Ms. Artzer explained that Building 12 has a roof but it also has giant doors "the size of locomotives that are always open." Doc. 74-4 at 5. So, in Ms. Artzer's view, all jobs in the Topeka shops are performed primarily outdoors. Carmen, Pipefitters, and Boilermakers spend at

least 90 percent of their work time in Building 12.  Both plaintiffs told BNSF that they could

work in the environments required by the Topeka shop jobs.

### III.    ANALYSIS

BNSF contends it deserves summary judgment because no genuine issues of material fact

exist and it is entitled to judgment as a matter of law on each of plaintiffs' claims.  First, on the

ADA claims, BNSF contends that plaintiffs have failed to establish a prima facie case.  Second,

BNSF contends that even if plaintiffs could establish a prima facie case for discrimination, no

reasonable jury could find its stated reasons for not hiring plaintiffs were pretextual.  BNSF

makes the same arguments for plaintiffs' ADA retaliation and failure to accommodate claims.

Then, on plaintiffs' FRSA claims, BNSF again asserts that plaintiffs have failed to establish a

prima facie case.  And even if plaintiffs could make a prima facie case under the FRSA, it argues

that summary judgment is still warranted because BNSF has shown that it would not have hired

plaintiffs for a reason wholly independent of any retaliatory motive.

In addition to its substantive arguments against plaintiffs' claims, BNSF also asserts that

plaintiffs failed to exhaust the administrative remedies for some ADA and FRSA claims.  The

court begins its analysis with this threshold issue.

### A.  Exhaustion

### 1.  Plaintiffs' ADA claims

"Title I of the ADA requires a plaintiff to exhaust [his] administrative remedies before

filing suit."  *Jones v. United Parcel Serv.*, 502 F.3d 1176, 1183 (10th Cir. 2007).  "In the Tenth

Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit."  *Id.*  An

ADA plaintiff must file a charge with the EEOC, and receive a right to sue letter from the EEOC,

before filing suit in federal court.  *Davenport v. Int'l Paper Co.*, No. 14-2424-DDC-GLR, 2015

WL 1523897, at *2 (D. Kan. Apr. 2, 2015) (citing *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1310, 1317 (10th Cir. 2005)).

### a. Mr. Lincoln's ADA claims

Mr. Lincoln filed his lone EEOC charge on February 10, 2013. BNSF argues that Mr. Lincoln thus has exhausted his administrative remedies under the ADA for adverse employment actions occurring between April 16, 2012 (300 days before he filed his EEOC charge), and February 10, 2013, when he filed this charge. Of the 21 jobs Mr. Lincoln applied for at BNSF, BNSF contends Mr. Lincoln exhausted his remedies only for the eight applications he submitted between April 16, 2012 and February 10, 2013. Mr. Lincoln disagrees.

He contends that his EEOC charge complains of an ongoing pattern of disability discrimination. And so, Mr. Lincoln asserts, because his EEOC charge was pending from February 10, 2013 until July 24, 2015, the EEOC had "more than adequate time to investigate his allegations" of continuing discrimination. Doc. 70 at 35. He thus claims that his EEOC charge exhausted all claims for adverse actions occurring between April 16, 2012 and July 24, 2015. Mr. Lincoln claims this includes the Boilermaker and Mechanical Shop Laborer positions, applications submitted on March 28, 2013. Mr. Lincoln never cites any law to support this view of the exhaustion requirement. The court has found none.

Mr. Lincoln next contends that BNSF waived any argument that he failed to exhaust his administrative remedies because the parties stipulated that Mr. Lincoln exhausted "[his] administrative remedies for employment actions occurring on or after April 16, 2012." Doc. 13 at 3. But, the parties' stipulation cannot manufacture jurisdiction where none exists. The law in the Tenth Circuit is clear: "exhaustion of administrative remedies is a jurisdictional prerequisite

to suit.'" *Jones*, 502 F.3d at 1183. BNSF cannot waive this requirement because it is jurisdictional in nature.

The court concludes that Mr. Lincoln failed to exhaust his administrative remedies for any claims based on adverse employment actions before April 16, 2012 and after February 10, 2013. This conclusion means that the court must consider whether BNSF's failure to appoint Mr. Lincoln to the following positions violated the ADA:

> (1) Mechanical Shop Laborer (July 19, 2012)
> (2) General Clerk-Administrative (August 1, 2012)
> (3) Pipefitter (August 1, 2012)
> (4) Clerk-Revenue Manager (August 29, 2012)
> (5) Carman (September 26, 2012)
> (6) Carman (November 1, 2012)
> (7) Mechanical Shop Laborer (November 1, 2012)
> (8) Pipefitter (November 1, 2012)

### b.  Mr. Mosbrucker's ADA Claims

Mr. Mosbrucker's exhaustion facts are different. Like Mr. Lincoln, he filed his first EEOC charge on February 10, 2013. But Mr. Mosbrucker amended his charge on May 7, 2015. According to BNSF, these filings suffice to exhaust his administrative remedies under the ADA for claims resulting from adverse actions on or after April 16, 2012 (300 days before February 10, 2013), until that later date, and on or after July 11, 2014 (300 days before May 7, 2015) until that later date. So, BNSF contends Mr. Mosbrucker's ADA claims based on adverse employment actions occurring before April 16, 2012 and between February 10, 2013 and July 11, 2014 are barred because he failed to exhaust his administrative remedies for claims based on such actions. This position, if correct, would exclude all but nine of Mr. Mosbrucker's 22 alleged adverse employment actions.

Mr. Mosbrucker disputes BNSF's exhaustion analysis. He contends that BNSF incorrectly excludes his application to the Boilermaker position on March 28, 2013. According

to Mr. Mosbrucker, this is so because his original charge with the EEOC described a pattern of failing to accommodate and retaliating, and that his amended charge "simply amplifie[d] that same pattern." Doc. 71 at 31. Mr. Mosbrucker asserts that his amended charge thus "relates back" to his original charge. Doc. 71 at 31. He relies on 29 C.F.R. § 1601.12 as support for his position. It provides:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b).

BNSF responds that Mr. Mosbrucker's reliance on § 1601.12 is misplaced because, "for the amendments to relate back, they must 'clarify or amplify allegations' contained in the original charge or add additional violations 'related to or growing out of the subject matter of the original charge.'" Doc. 81 at 18 (citing 29 C.F.R. § 1601.12(b)). And because "each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted," *Jones*, 502 F.3d at 1186, the original charge could not have contained facts based on positions that Mr. Mosbrucker had not yet applied for when he filed his first charge. Doc. 81 at 18.

The court agrees with BNSF. Each time BNSF declined to hire Mr. Mosbrucker for a BNSF job, it constituted a separate and discrete incident of alleged discrimination or retaliation. *See Jones*, 502 F.3d at 1186 ("each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted.") (internal quotation marks omitted). His original charge of discrimination could not

have contained "subject matter" "related to or growing out of" positions he had not yet sought.

29 C.F.R. § 1601.12

The court's conclusion about the time period covered by Mr. Mosbrucker's exhaustion efforts means that Mr. Mosbrucker has exhausted his administrative remedies for ADA claims based on nine applications he submitted. They are:

> (1) Mechanical Shop Laborer (July 17, 2012)
> (2) Senior Analyst for Payroll Production (July 31, 2012)[2]
> (3) General Clerk-Administrative (July 31, 2012)
> (4) Pipefitter (July 31, 2012)
> (5) Carman (July 31, 2012)
> (6) Technology Services Mgmt. Trainee (October 10, 2014)
> (7) Mechanic Diesel Engine (November 5, 2014)
> (8) Mechanical Shop Laborer (November 24, 2014)
> (9) Electrician Diesel Engine (November 26, 2014)

The court's analysis of Mr. Mosbrucker's ADA claims, below, considers the adverse actions resulting from those nine applications.

## 2. Plaintiffs' FRSA Claims

BNSF contends that both plaintiffs failed to exhaust their administrative remedies to bring certain claims under the Federal Railroad Safety Act ("FRSA"). This act requires an employee alleging a violation under it to exhaust his administrative remedies by filing a complaint with the Occupational Safety and Health Administration ("OSHA") within 180 days of the alleged violation. 49 U.S.C. § 20109(d)(1)–(2)(ii).

### a. Mr. Lincoln's FRSA Claim

BNSF asserts that Mr. Lincoln filed just one complaint with OSHA, on September 12, 2014. According to BNSF, this filing enabled Mr. Lincoln to exhaust his administrative

---

[2] In their statement of facts, the parties agree that Mr. Mosbrucker applied for the Senior Analyst for Payroll Production on August 31, 2013. In their arguments, however, the parties state Mr. Mosbrucker applied on July 31, 2012. Because the July 31, 2012 date falls within a window covered by Mr. Mosbrucker's exhaustion efforts, and because the parties seem to agree that this application supports one of the claims for which Mr. Mosbrucker has exhausted his administrative remedies, the court assumes in this Order that the August 2012 date is the correct one.

remedies for adverse employment actions occurring between March 16, 2014 and September 12, 2014. Mr. Lincoln does not contest BNSF's position. The only "unfavorable personnel action" he identifies in the relevant portion of his Opposition is BNSF's refusal to hire him for the Safety Assistant position—a position he was denied in July 2014. *See* Doc. 70 at 54. Mr. Lincoln thus has exhausted the administrative remedies for a FRSA claim for just this one application and the court limits its FRSA analysis to BNSF's decision not to appoint Mr. Lincoln to it.

### b. Mr. Mosbrucker's FSRA Claims

BNSF asserts that Mr. Mosbrucker filed an original FRSA complaint on November 13, 2014, and then amended this complaint on January 28, 2015. Applying the 180 day period to each filing, BNSF contends that Mr. Mosbrucker's filings exhausted his remedies only for adverse actions occurring after May 17, 2014 and before January 28, 2015. During this period, BNSF declined to hire Mr. Mosbrucker for the following positions: (1) Technology Services Management Trainee (October 10, 2014); (2) Mechanic Diesel Engine position (November 5, 2014); (3) Mechanical Shop Laborer (November 24, 2014); and (4) Electrician Diesel Engine position (November 26, 2014). Mr. Mosbrucker does not appear to contest BNSF's exhaustion argument, because the only "unfavorable personnel action" he addresses in the FRSA portion of his Opposition is BNSF's refusal to hire him as a Mechanical Shop Laborer on November 24, 2014.[3] Doc. 71 at 49. The court thus limits its analysis to whether BNSF's decision not to appoint Mr. Mosbrucker to the Mechanical Shop Laborer position violated the FRSA.

---

[3] It is unclear why Mr. Mosbrucker does not identify any other adverse personnel decisions in this portion of his Opposition. *See* Doc. 71 at 45–50 (omitting any discussion of or reference to the Technology Services Management Trainee position (denied October 10, 2014), the Mechanic Diesel Engine position (denied November 5, 2014), or the Electrician Diesel Engine Position (denied November 24, 2014)). But, by failing to mention any other actions in his Response to BNSF's Motion for Summary Judgment, Mr. Mosbrucker abandons his other arguments for BNSF's unfavorable personnel actions under the FRSA. *See Bland v. Kansas City, Kansas Cmty. Coll.*, 271 F. Supp. 2d 1280, 1283 (D. Kan. 2003) (finding that the plaintiff impliedly conceded her argument by failing to mention it in her Response).

Having determined which of plaintiffs' ADA and FRSA claims survive the exhaustion analysis, the court now addresses the substance of those claims.

### B. Plaintiffs' ADA Discrimination Claims

Each plaintiff claims BNSF discriminated in violation of the ADA by failing to hire him for certain positions. The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In cases involving general discrimination claims under this act, the Tenth Circuit has adopted the burden shifting scheme first established in *McDonnell Douglas Corp. v. Green*.[4] *See, e.g., Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).

The first stage of this scheme requires the plaintiff to establish a prima facie case of discrimination. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). The prima facie case requires a plaintiff to establish that: "(1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated 'under circumstances which give rise to an inference that the termination was based on [his] disability.'" *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (quoting *Morgan*, 108 F.3d at 1324).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant. This burden requires the employer to "proffer a legitimate, nondiscriminatory reason for the adverse employment action." *Den Hartog*, 129 F.3d at 1085 (citing *McDonnell Douglas*, 411 U.S. at 802). "If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016).

---

[4] 411 U.S. 792 (1973).

Here, for summary judgment purposes, BNSF concedes that both plaintiffs were disabled within the meaning of the ADA. BNSF contests the second prong of plaintiffs' prima facie case, however, claiming plaintiffs cannot show that they were qualified individuals under the ADA.

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Under this definition, "consideration shall be given to the employer's judgment as to what functions of a job are essential," and an employer's written job description "shall be considered evidence of the essential functions of the job." *Id.* The Tenth Circuit "clearly articulated" the ADA roadmap for the essential function inquiry in *Wells v. Shalala*.[5] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 887 (10th Cir. 2015) (citing *Wells*, 228 F.3d at 1144). The controlling analysis adopted here has two parts.

In the first, the court must determine whether the plaintiff can perform the "essential functions of the job, *i.e.*, functions that bear more than a marginal relationship to the job at issue." *Wells*, 228 F.3d at 1144. This determination, our Circuit has held, "involves consulting the regulatory factors provided by the EEOC." *Hawkins*, 778 F.3d at 887. The relevant EEOC guidance provides:

> Evidence of whether a particular function is essential to a job includes (but is not necessarily limited to) (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Id.* The second step of the analysis is more direct. It requires the court to determine "whether any reasonable accommodation by the employer would enable him to perform those functions." *Id.* at 888 (quoting *Wells*, 228 F.3d at 1144) (brackets in *Hawkins* omitted). Here, the dispute

---

[5] 228 F.3d 1137 (10th Cir. 2000).

focuses on step one: What are the "essential functions" of the various jobs sought by plaintiffs? Resolving this dispute requires a closer look at the authority applying this step of the analysis.

Our Circuit has explained that courts should begin with the employer's judgment about what functions are essential to perform a job. This determination is entitled to "considerable weight." *See, e.g., Hawkins*, 778 F.3d at 888; *see also Wells*, 228 F.3d at 1144–5 (affirming summary judgment and noting that plaintiff's single, self-serving affidavit was insufficient to overcome the employer's "overwhelming evidence" consisting of a written job description and affidavits from three company supervisors that travel was an essential function of the job at issue); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (the *Wells* rubric envisions deference to an employer's judgment about a job's essential functions). These principles have coalesced to form the "prototypical" approach to the essential function question:

> The employer describes the job and functions required to perform that job. We will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity. In short, the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards.

*Id.* (citations omitted) (internal question marks omitted). *See also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999) ("It is [the] employer's province to define the job and the functions required to perform it.").

Still, the governing law recognizes that this deference has some limits. For instance, it has emphasized that "employer's judgment [about a job's essential functions] is not conclusive evidence." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 997 (10th Cir. 2012). And, the court of appeals has cautioned that "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Id.* (quoting *Davidson v. Am. Online*, 337 F.3d 1179, 1191 (10th Cir. 2003)).

The Tenth Circuit has characterized this competition between the employer's judgment about a job's essential functions and a plaintiff's right to contest the employer's judgment as an "evidentiary tug-of-war."  *Hawkins*, 778 F.3d 888.

The current motion requires the court to apply this rubric at summary judgment stage. While many of the cases are not explicit about it, the court concludes that the essential function analysis operates within the larger context created by the summary judgment standard.  That is, the court's task at summary judgment is to assess whether BNSF has adduced admissible evidence about job functions that it, as the employer, deems essential to the jobs at issue for each plaintiff.  If so, the court then considers whether plaintiffs have responded with admissible evidence sufficient under the Circuit's rubric to create a genuine dispute about the essential-ness of one or more functions for such jobs.  *See Mason*, 357 F.3d at 1122 (explaining that the "question of whether an employee can perform the essential functions of [their] job is a mixed question of law and fact" and concluding that though a jury may need to determine the essential functions of a job in some cases, no reasonable jury could find for plaintiffs on the essential functions question at issue there.).

The court analyzes the two plaintiffs separately, below.

## 1.  Mr. Lincoln

Mr. Lincoln applied for both clerk jobs and shop jobs with BNSF during the relevant time period.  So, the question the court must decide is whether a reasonable jury could find that Mr. Lincoln was qualified to perform the essential functions of the clerk jobs and shop jobs for which he applied.  This analysis begins with the two clerk jobs for which Mr. Lincoln exhausted his administrative remedies under the ADA:  the General Clerk-Administrative job (August 1, 2012) and the Clerk-Revenue Manager job (August 29, 2012).

### a. Clerk positions

#### i. Qualified

Mr. Lincoln applied for the General Clerk-Administrative and Clerk-Revenue Manager positions. The only evidence BNSF has produced about the essential functions of the General Clerk-Administrative position is the job posting's written description of position. It listed the following skills as the job's basic qualifications:

> (1) minimum 25 WPM typing rate, 35 WPM preferred, (2) minimum of one year of verifiable training and/or work experience in an administrative function within an office environment, (3) minimum of 1 year of verifiable training and/or work experience resolving internal and/or external customer issues via telephone and/or email correspondence, and (4) basic level skills in Microsoft Office Suite.

Doc. 59-33 at 2–3. For the Clerk-Revenue Manager position, BNSF produced evidence in the form of deposition testimony by Ms. Artzer. Ms. Artzer testified that the basic requirements of the Clerk-Revenue Manager position included at least one year of clerical experience, customer service experience, and passing the Microsoft Office Suite test.

Mr. Lincoln does not contest that he lacked some of the qualifications for each job.[6] Nor does Mr. Lincoln meaningfully dispute that the experience BNSF requires is essential. Instead, he cites testimony by some of BNSF's witnesses stating that they believed he could perform the clerk jobs. Mr. Lincoln, for example, cites testimony by Ms. Jones—BNSF's Field Manager for the MEH Department— that she "believe[d] he had some administrative-type skills that would have been a good fit" for the clerk positions. Doc. 73-7 at 10. Mr. Lincoln also relies on

---

[6] Mr. Lincoln attempts to create a genuine issue of fact by denying that these requirements were the basic qualifications for the position. He does not, however, deny that he lacked one year of training and work experience in an administrative function within an office environment and resolving customer issues via telephone and email correspondence.

testimony given by BNSF's Human Resources manager, Ms. Artzer.  Ms. Artzer's testimony is particularly interesting.

When plaintiffs' counsel asked Ms. Artzer whether Mr. Lincoln was qualified for the "administrative clerk position from 2010," she answered that "he did" have "the basic minimum qualifications."  Doc. 73-5 at 4.  BNSF's counsel interjected, asking which position was under discussion.  *Id.*  Plaintiffs' counsel then objected to the interruption by BNSF's counsel, presumably because it was not yet BNSF's turn to question the witness.  *Id.*  Ms. Artzer then backtracked, asserting that she didn't "understand the question."  *Id.*  Plaintiffs' counsel asked the court reporter to read back his most recent question and Ms. Artzer's answer to it.  Once the reporter did so, counsel then asked the same question again and, this time, Ms. Artzer responded that she just didn't know.  The precise exchange reads like this in the deposition transcript:

> Q [BY PLAINTIFFS' COUNSEL].  All right.  I want to ask you about the administrative clerk position from 2010.  I think you essentially said that most of those people would have had – that applied would have had more experience?
>
> **A [BY MS. ARTZER].        A lot more.**
>
> Q.      Was he qualified for the job?
>
> **A.      Are you talking the basic minimum qualifications?  He did.**
>
> [BNSF'S COUNSEL INTERJECTING]:      Wait a minute.  What position are we speaking to?
>
> [PLAINTIFFS' COUNSEL]:  David [referring to BNSF's counsel by his first name], I appreciate to some extent I think you are trying to be helpful.  But I don't think it's okay for you to cut the witness off mid answer.
>
> [BNSF'S COUNSEL]:      Well, I can object to form.
>
> **A [BY MS. ARTZER].      I don't understand the question.  I don't understand your question.**

Q [BY PLAINTIFFS' COUNSEL].   You were answering it.

**A.      I started to answer, yes.**

Q [BNSF'S COUNSEL].   Could you read the question back, please?

(THREUPON, the court reporter read back the following testimony:

Q.      Was he qualified for the job?)

[BNSF'S COUNSEL]:  Object to form, which job?

BY [PLAINTIFFS' COUNSEL]:

Q.      The clerk job that he applied for on August 2nd, 2010?

**A.      I wasn't there, I don't know.**

Q.      You are the 30(b)(6) witness, you've been designated to testify about this.

[BNSF'S COUNSEL]: Okay, if you're clarifying that, was he qualified for that job?

**A.      No, because he failed the test.**

Q.      Okay, what test?

**A.      The aptitude test for clerks.**

Doc. 73-5 at 4–5.

In its moving papers, BNSF contends that once Mr. Lincoln's counsel clarified that the position in question was the clerk job Mr. Lincoln applied for on August 2, 2010, Ms. Artzer testified "unequivocally" that Mr. Lincoln was not qualified.  Doc. 80 at 29.  This argument is simply not faithful to the deposition transcript.  It reveals that Ms. Artzer, testifying as BNSF's representative under Fed. R. Civ. P. 30(b)(6) on this subject, also testified that she believed Mr. Lincoln had the minimum qualifications for the 2010 clerk position.

Certainly, one interpretation of Ms. Artzer's testimony is that she was confused about the position that was the subject of this questioning. But another rational interpretation of this testimony is that BNSF's designated representative viewed Mr. Lincoln as qualified for the 2010 clerk's position. If the summary judgment standard permitted the court to act as a factfinder, perhaps it could conclude that Ms. Artzer, as BNSF contends, was confused at first about the position at issue during this questioning; and so a reasonable factfinder might chose to disregard that aspect of Ms. Artzer's testimony. But the standard does not permit factfinding at summary judgment. Instead, the court must view both the evidence and all the inferences it reasonably permits in the light most favorable to Mr. Lincoln, the non-moving party. *Nahno-Lopez*, 625 F.3d at 1283. So, at bottom, the court has two pieces of conflicting evidence. On one side, there is testimony by BNSF that Mr. Lincoln was qualified for the 2010 clerk position. And on the other side, BNSF's job posting for that clerk position establishes minimum requirements that – it is uncontroverted – Mr. Lincoln lacked.

After close consideration, the court concludes that this factual dissonance creates a material question that summary judgment cannot resolve. In so concluding, the court is aware that Mr. Artzer's testimony involved Mr. Lincoln's application for a clerk's position in 2010. And he did not exhaust his remedies for any 2010 positions. But, he did exhaust his remedies for a 2012 application for a clerk's position. And nothing in the record suggests that the requirements for the 2012 position differed from the 2010 requirements. In the court's judgment, this evidence—and the inference it rationally permits—when combined with Ms. Artzer's testimony creates a genuine factual dispute whether Mr. Lincoln was qualified to perform the essential functions of the 2012 clerk position. The court thus cannot conclude on summary judgment that Mr. Lincoln has failed to establish the second component of his prima facie case.

ii. Based on Disability

BNSF's summary judgment motions also attack a second aspect of Mr. Lincoln's prima facie case. That is, BNSF claims plaintiff cannot sustain his burden to show that a reasonable jury could find that BNSF refused to hire him under circumstances giving rise to an inference that the decision was based on his disability. *See Smothers*, 740 F.3d at 544 (third requirement in three part test for prima facie case in an ADA action). To carry the burden imposed by this component, Mr. Lincoln must adduce some evidence that his disability was a determining factor in BNSF's decision. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001).

Mr. Lincoln contends the circumstances surrounding BNSF's refusal to hire him for the clerk positions support an inference of discrimination because Ms. Artzer "harbored bias against [Mr.] Lincoln on the basis of his having been injured." Doc. 70 at 45. When asked about Mr. Lincoln's application and interview for the Boilermaker position, Ms. Artzer testified that "from [her] recollection, [Mr. Lincoln and Mr. Mosbrucker's] commitment to safety seemed somewhat lacking." Doc. 73-5 at 6. BNSF contends that Mr. Lincoln was not hired because he was not the best qualified for the clerk positions. And, BNSF contends that Ms. Artzer did not know about Mr. Lincoln's injury, disability, or demand letter until his October 1, 2012 request for accommodation. BNSF thus argues no discriminatory motive could have provided a basis for her hiring decisions for the clerk positions because she made those decisions on August 1, 2012 and August 29, 2012.

The only evidence Mr. Lincoln produces to support an inference of discrimination is a comment Ms. Artzer made about his interview for a shop position—that his commitment to safety seemed lacking and this affected his interview score. Standing alone, no reasonable jury could find this comment to reflect a discriminatory animus toward hiring Mr. Lincoln for any

position, let alone a different position than the one Ms. Artzer was discussing in her testimony. While a plaintiff's burden at the prima facie state is "not onerous," *Hawkins*, 778 F.3d at 883, it is the plaintiff's burden to raise at least a "genuine issue of material fact on each element of his prima facie case." *Id.* On this issue, the only evidence Mr. Lincoln relies on is Ms. Artzer's testimony. Without more, Mr. Lincoln has not adduced evidence from which a reasonable jury could conclude that the circumstances surrounding BNSF's refusal to hire him supports an inference of discrimination. Mr. Lincoln thus has failed to establish a prima facie case of discrimination for BNSF's failure to hire him to the clerk jobs. BNSF is thus entitled to summary judgment on this aspect of Mr. Lincoln's ADA claim.

### iii. Pretext

Even if a reasonable jury could conclude that Ms. Artzer's testimony supports an inference of discrimination on Mr. Lincoln's clerk claims, BNSF is entitled to summary judgment for a second, independent reason. If Mr. Lincoln could meet all the touchstones for a prima facie case, the burden would shift to BNSF to articulate a legitimate, non-discriminatory reason for its decision. BNSF has done so. BNSF has explained that Mr. Lincoln was not hired for the clerk positions because he was not the best qualified candidate. Articulating this legitimate reason unrelated to disability shifts the burden back to Mr. Lincoln to "show a genuine issue of material fact as to whether" BNSF's articulated reason for not hiring him for the clerk position is merely pretextual. *Kilcrease*, 828 F.3d at 1220.

"A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 900 (10th Cir. 2017). When assessing a pretext contention, the court

examines the facts as they appear to the person making the decision not to hire the plaintiff. *Selenke*, 248 F.3d at 1261. The court may not second guess the business judgment of the employer. *Id.*

In his Opposition, Mr. Lincoln refers to "numerous facts" that he claims demonstrate pretext. Doc. 70 at 47. One, he claims that BNSF's original decision to remove him from service because of his medical condition provides sufficient evidence of pretext. Two, Mr. Lincoln also alleges that BNSF's refusal to engage in the interactive process with him is more evidence of pretext. Three, he contends the EEOC found that he was qualified for the clerk position. Four, he contends that BNSF rejected him for the Safety Assistant position without discussion, and that this is evidence of pretext. Fifth, he contends that the very fact that Ms. Artzer was the hiring manager for all the jobs he applied for supports an inference of discrimination. Last, he contends BNSF's similar treatment of Mr. Mosbrucker is evidence of pretext. But, Mr. Lincoln has not adduced evidence from which a reasonable jury could conclude that BNSF's nondiscriminatory reason for failing to hire him for the clerk position was pretext. None of these theories of pretext are so "incoherent, weak, inconsistent, or contradictory" that they would permit a rational jury to find them unworthy of belief.

First, almost none of Mr. Lincoln's pretext evidence connects to his application for the clerk positions. Instead, Mr. Lincoln makes general references to conclusory arguments from other parts of his Opposition. Second, viewing the facts as they appeared to the person making the employment decision, Mr. Lincoln was not the most qualified person for the job. Taking into consideration Ms. Artzer's contested testimony that he had the "basic minimum qualifications" for the position, Doc. 59-4 at 2, Mr. Lincoln's qualifications still are lacking. The job posting for the General Clerk-Administrative position sought an applicant with a 25 WPM tying rate, 35

WPM preferred. Mr. Lincoln's rate was 26 WPM. And, while Mr. Lincoln asserts that Ms. Artzer believed he was qualified for the clerk position, he does not contest that he lacked some of the basic qualifications for the position, *e.g.*, one year clerical experience.[7] None of the evidence Mr. Lincoln relies on suggests BNSF's stated reason for refusing to hire him for the clerk positions is incoherent, weak, inconsistent, or contradictory. And neither separately nor collectively can they provide a rational factfinder to conclude that BNSF's reason is unworthy of belief.

### iv. Conclusion about Clerk Positions

In sum, the court concludes summary judgment is warranted against Mr. Lincoln's ADA discrimination claims based on his applications for the two clerk positions that survived the exhaustion analysis. The court thus grants BNSF's Motion for Summary Judgment on Mr. Lincoln's clerk positions.

### b. Shop positions

Mr. Lincoln's second set of ADA discrimination claims relies on his applications for several shop positions. In part III.A.1.a., above, the court has concluded that six shop positions he sought unsuccessfully survive the exhaustion analysis. The analysis below considers all six.

As with the clerk position, the first step in determining whether Mr. Lincoln is qualified considers whether Mr. Lincoln can perform the essential functions of these jobs. *Hawkins*, 778 F.3d at 887. *Id.* The second step considers whether any reasonable accommodation by the employer would have enabled Mr. Lincoln to perform the functions of those jobs. *Id.* at 887–888.

---

[7] Mr. Lincoln attempts to controvert this fact by asserting that the basic requirements BNSF listed for the clerk positions (clerical experience, customer service experience, and typing skills) were not actually the minimum requirements for the position, and that he did have some Microsoft office skills. But Mr. Lincoln does not contest that he lacked one year clerical and customer service experience. *See* Doc. 70 at 13–14.

Whether Mr. Lincoln's shop-based ADA discrimination claims survive summary judgment boils down to one question: Was Mr. Lincoln qualified to perform the essential functions of the shop positions he sought? BNSF contends he was not, because working outside is an essential function of each shop position and, it is uncontested, Mr. Lincoln was restricted from working outside. Mr. Lincoln resists summary judgment on the theory that working outside is not an essential function of the shop positions.

1. Essential Functions

In *Hawkins v. Schwan's Home Service, Inc.*,[8] the Tenth Circuit closely analyzed whether the plaintiff was qualified, as a matter of law, to perform the essential functions of his job. The plaintiff in that case brought ADA discrimination claims against his former employer after being forced to resign for failing to provide medical certification. The *Hawkins* plaintiff had worked as a supervisor where he was employed by Schwan's Home Service when he failed a routine Department of Transportation ("DOT") medical evaluation. *Hawkins*, 778 F.3d at 881. The district court concluded that DOT qualification was an essential function of the supervisor position and granted summary judgment against plaintiff's claim. Without a DOT certification, the court concluded, no reasonable jury could find that plaintiff was qualified to perform the essential functions of the supervisor position. *Id.* at 882.

On appeal, the Tenth Circuit concluded that whether plaintiff was qualified to perform the essential functions of the supervisor position represented "the determinative issue in the case." *Id.* at 883. The Tenth Circuit weighed the following factors from an EEOC regulation to determine the essential functions of the job:

---

[8] 778 F.3d 887 (10th Cir. 2015).

> (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Id.* at 887 (citing 29 C.F.R. § 1630.2(n)(3)).  In the district court, defendant had presented evidence that it judged DOT qualification as an essential function of the supervisor position (factor 1) so the supervisors could "pick up and deliver vehicles for service and repair and facilitate the fueling and the loading and unloading of goods from the vehicles."  *Id.* at 890.  Though a supervisor might not have to operate a commercial vehicle on a daily basis, it was essential that the supervisor, if necessary, could assume the tasks typically handled by the employees he supervised.  *Id.*  The employer also presented evidence of its written job description (factor 2) for the supervisor position.  It expressly listed "DOT certification."  *Id.*  The employer did not produce any evidence about the last two factors—consequences of not requiring the incumbent to perform the function and the current work experience of incumbents in similar jobs.  But plaintiff never disputed the employer's evidence except with "reference to his personal view that 'in some depots the facility manager has to drive and in others he or she did not.'"  *Id.* at 893.  The Tenth Circuit affirmed the district court's determination that, as a matter of law, DOT certification was an essential function of the supervisor position.  *Id.*

As did the employer in *Hawkins*, BNSF has submitted evidence that working outside is an essential function for all its shop positions.  First, BNSF produced a job posting with a written description for each of the shop positions.  Each description included the following job requirements:  "[a]ble to work outdoors in all weather conditions (hot, cold, rain, snow, and sleet)."  *See* Docs. 59-34 at 2, 59-35 at 2, 59-36 at 2.  Second, BNSF provided evidence of its judgment about which shop position functions are essential.  Specifically, BNSF relied on

testimony by Ms. Artzer that even though the shop positions often work inside Building 12, Building 12 has "giant doors the size of locomotives that are always open." Doc. 70 at 30; Doc. 74-4 at 5. She also testified that since the plaintiffs were taken out of work, there have not been any shop jobs that employees perform mostly inside. Doc. 74-4 at 4. In contrast, BNSF presents no evidence about the third and fourth factors from *Hawkins*, *i.e.*, the consequences of not requiring someone in the shop to be able to work outdoors or about the work experience of incumbents in similar jobs.

"Once the employer has come forward with evidence that a job function or requirement is essential"—as BNSF has done here—"the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential." *Kilcrease*, 828 F.3d at 1222. Here, Mr. Lincoln disputes BNSF's evidence by asserting that the shop positions he applied for (Mechanical Shop Laborer, Pipefitter, and Carman) are actually performed "90%" indoors, in Building 12, "a partially climate controlled building" Doc. 70 at 37–38. Mr. Lincoln also has adduced evidence in the form of a declaration by Steve Hopkins, a Truck Supervisor for BNSF, to support his view about the outdoors requirement. Mr. Hopkins testified in his declaration that much of the shop position work is performed inside Building 12, and that Building 12 is kept relatively warm in the winter "such that workers there will need no more than light jackets." Doc. 73-14 at 1. And Mr. Hopkins stated that in the summer, Building 12 is kept comfortable by "many fans operating and by the open doors." Doc. 73-14 at 2. Finally, Mr. Lincoln produced photo evidence of Building 12, which depicts a large warehouse which, in the photos at least, is completely enclosed. Doc. 70 at 30.

The record on this issue is not as robust as one might hope. Neither party has presented the kind of record that would produce a blowout win on what *Hawkins* calls "the evidentiary tug-

of-war" used by the essential functions analysis. 778 F.3d at 888. True, BNSF has presented evidence sufficient to allow the court to find that factors one and two weigh in its favor. Namely, it produced written job descriptions (factor 2) for each shop position; each one required holders of those jobs to be "[a]ble to work outdoors in all weather conditions." *See* Docs. 59-34 at 2, 59-35 at 2, 59-36 at 2. It also presented Ms. Artzer's testimony explaining why BNSF judged the capacity to work outdoors (factor 1) was essential. As she explained, the doors in Building 12 are large ones and they almost always are open. But though BNSF submitted a large summary judgment record, it provided no evidence about the consequences of not requiring shop workers to have the capacity to work outdoors (factor 3) or the experience of current shop workers (factor 4).

But Mr. Lincoln's evidence on this important issue is thinner. He adduced no evidence about the experience of workers in Building 12—where he would have worked in the shop jobs he sought. Indeed, the only evidence Mr. Lincoln provides is Mr. Hopkins' Declaration. It describes his experience in a different location, Building 17. And even if the court were to infer that conditions in Building 17 and 12 are the same—an inference not explicitly required or justified by the summary judgment record—it wouldn't help Mr. Lincoln. Mr. Hopkins' Declaration never asserts that shop workers did not have to work outdoors. This silence comports with Mr. Lincoln's view of the shop jobs—which he portrays as ones involving "90 percent" indoors work. Doc. 73-14 at 1.

While the record on this issue is imperfect, it closely resembles the summary judgment record in *Hawkins*. Both employers presented undisputed evidence about factors 1 (employer's judgment) and 2 (written job descriptions). And neither employee provided evidence about factors 3 (consequences of not requiring candidates to perform the function) or 4 (current work

experience). Also, as with the *Hawkins* plaintiff, Mr. Lincoln has made no showing that directly challenges the employer's position. It seems evident from the summary judgment facts that not all shop workers work outdoors all the time. But Mr. Lincoln adduces no evidence of even one shop worker who works only indoors.

After close comparison, the court concludes that BNSF has won the tug-of-war. The summary judgment facts on all four factors is almost identical to the summary judgment facts about the same factors in *Hawkins*. And in that case, the Circuit affirmed an order granting summary judgment to the employer. This similarity, combined with the court's duty to "place[ ] considerable weight on an employer's judgment concerning a particular job's essential functions," 778 F.3d at 888 (internal quotation marks omitted), precludes a reasonable jury from finding that working outside is not an essential function of the shop positions which Mr. Lincoln sought with BNSF.

2. Reasonable Accommodation

So, the next step in determining whether Mr. Lincoln was qualified to perform the essential functions of the shop positions requires the court to consider whether any reasonable accommodation by BNSF would have enabled Mr. Lincoln to perform the functions of the shop positions. *Hawkins*, 778 F.3d at 887–88. Reasonable accommodations may include "job restructuring, . . . modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices or policies, . . . and other similar accommodations." *Hawkins*, 778 F.3d at 884.

Mr. Lincoln brings a separate failure to accommodate claim against BNSF, which is discussed later in this order. Mr. Lincoln does not propose reasonable accommodations in his Opposition, but rather asserts that BNSF failed to discuss certain accommodations with him. Mr.

Lincoln contends BNSF never discussed with him the possibility that "to the extent some minimal outside tasks were required [for the shop positions], those duties could be shared with other employees." Doc. 70 at 42. Mr. Lincoln also contends that BNSF failed to discuss with him whether he could work within the "heat-controlled confines" of Building 12. *Id.* But this does not matter. BNSF has produced evidence that the ability to work outside was an essential function of the shop positions. *See* part III.B.1.b.i.1. *supra*. The Tenth Circuit has held that it is not reasonable "to require an employer . . . to require a redefinition of the essential requirements of a vacant job so as to bring it within the qualification of a disabled employee." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 (10th Cir. 1999). Mr. Lincoln has not produced any evidence that accommodations such as sharing duties with other employees or staying within certain confines of Building 12 avoid a substantial modification of the shop position's requirements. Although some job restructuring may be reasonable, substantial modifications of essential job requirements are not. *Id.* Requiring other employees to share Mr. Lincoln's job responsibilities in the shop positions, or to limit Mr. Lincoln's work to the heat-controlled confines of Building 12 are substantial modifications of essential job requirements—that the employee is able to work outdoors in all weather conditions.

Because no reasonable jury could find that Mr. Lincoln was qualified, with or without reasonable accommodation, to perform the essential functions of the shop positions he sought, Mr. Lincoln has failed to establish a prima facie case of ADA discrimination for the shop positions. BNSF thus is entitled to summary judgment as a matter of law.

ii.   Pretext

Finally, and even if Mr. Lincoln could make a prima facie case of discrimination under the ADA, BNSF is still entitled to summary judgment under the *McDonnell-Douglas* burden

shifting framework. If Mr. Lincoln had stated a prima facie case of discrimination, the burden merely would shift to BNSF to state a legitimate, nondiscriminatory reason for its decision not to hire him. BNSF has done so. BNSF asserts that Mr. Lincoln was not hired for the shop positions because he was not the best qualified for the positions. BNSF asserts that Mr. Lincoln could not work outside, and thus lacked the required qualifications. So, the burden shifts back to Mr. Lincoln to show a "genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Kilcrease*, 828 F.3d at 1218.

Mr. Lincoln adduced no additional evidence creating a genuine issue of material fact whether BNSF's decision was pretextual. Mr. Lincoln relies on the same evidence for pretext as he did for the clerk positions. None of the circumstances he relies on are such that a reasonable jury could find that BNSF's stated reason for not hiring Mr. Lincoln—that he was not the best qualified—is pretextual. BNSF's Motion for Summary Judgment is thus granted against Mr. Lincoln's shop position for this additional reason.

### 2. Mr. Mosbrucker

Turning now to Mr. Mosbrucker's ADA claims, the analysis is similar. Mr. Mosbrucker also applied for both clerk jobs and shop jobs. And he exhausted his administrative remedies under the ADA for some, but not all of those applications. *See* part III.A.1.b. So, the question for the court is whether a reasonable jury could find that Mr. Mosbrucker was qualified to perform the essential functions of the relevant clerk and shop jobs for which he applied.

### a. Clerk Positions

Mr. Mosbrucker applied for the following clerk positions during the time period for which he exhausted administrative remedies under the ADA: General Clerk-Administrative, Senior Analyst for Payroll Production,[9] and Technology Services Management Trainee.

BNSF asserts that Mr. Mosbrucker was not qualified for any of these clerk positions. According to BNSF, Mr. Mosbrucker lacked the minimum qualifications for the positions, including one year of clerical experience, one year of customer service experience, and the Microsoft Office skills. Further, BNSF notes that a bachelor's degree was required for the Management Trainee position, and Mr. Mosbrucker's college education was limited to a welding certification. Doc. 61 at 46.

In his Opposition, Mr. Mosbrucker never contests that he lacked the qualifications for the clerk positions for which he applied. Because Mr. Mosbrucker has abandoned these claims, *see Bland v. Kansas City, Kansas Cmty. Coll.*, 271 F. Supp. 2d 1280, 1283 (D. Kan. 2003) (finding that the plaintiff impliedly conceded her argument by failing to mention it in her Response), BNSF's Motion for Summary Judgment is granted on this issue.

### b. Shop Positions

This leaves Mr. Mosbrucker's applications for shop positions. The first step of the analysis considers whether Mr. Mosbrucker can establish a prima facie case based on BNSF's decisions not to hire him for any of those positions. The prima facie case asks, first, whether Mr. Mosbrucker can perform the essential functions of the job. *Hawkins*, 778 F.3d at 877. If not, the prima facie case asks whether any reasonable accommodation by the employer could enable plaintiff to perform the functions. *Id.*

---

[9] The parties agree that the Senior Analyst Payroll Production job posting was "cancelled." The parties do not explain this undisputed fact further, but they do not dispute it or raise any arguments about Mr. Mosbrucker's application based on it.

i. Qualified Individual

BNSF asserts that Mr. Mosbrucker lacked the minimum qualifications for the shop positions he sought because each position required the applicant to be able to work outdoors in all weather conditions including "hot, cold, rain, snow and sleet." *See, e.g.,* Doc. 59 at 43. As for Mr. Lincoln, BNSF presents evidence of the written job description of the shop positions and its judgment about which functions of the shop positions are essential. It is also undisputed that Mr. Mosbrucker was restricted from working outdoors when he applied for the shop positions.

Like Mr. Lincoln, Mr. Mosbrucker contends that the shop positions he applied for (Mechanical Shop Laborer, Pipefitter, and Carman) are actually performed 90% indoors, in Building 12, a partially climate controlled building. Mr. Mosbrucker also relies on Steve Hopkins' Declaration to contradict BNSF's evidence. *See* Doc. 71 at 12.

As discussed in detail above, the court must give BNSF's judgment considerable deference about the essential functions of its job. BNSF has adduced evidence that it considers the ability to work outside an essential function of the shop positions. And, Mr. Hopkins' Declaration does not dispute this evidence or otherwise show that working outside is not an essential function. The analysis parallels the one applied to Mr. Lincoln's claims based on shop positions. *See* part III.B.1.b.i.1. *supra*. And as with Mr. Lincoln's claims, the court concludes that the Circuit's decision in *Hawkins* favors summary judgment. The summary judgment facts preclude a reasonable jury from finding that working outside was not an essential function of the shop positions. And so, the court grants summary judgment on this issue.

ii.   Reasonable Accommodation

This conclusion leads to the next phase of the analysis:  whether any reasonable accommodation by the employer would enable Mr. Mosbrucker to perform the functions of the shop positions.  *Hawkins*, 778 F.3d at 887–88.

Like Mr. Lincoln, Mr. Mosbrucker brings a separate failure to accommodate claim against BNSF, which is discussed later in the order.  And, also like Mr. Lincoln, Mr. Mosbrucker asserts that BNSF never discussed the possibility that the shop jobs could be altered or shared to allow him to do them, or if he could have worked only in the climate controlled confines of Building 12.  Doc. 71 at 37.  As discussed above, however, the Tenth Circuit has held that it is not reasonable "to require an employer . . . to require a redefinition of the essential requirements of a vacant job so as to bring it within the qualification of a disabled employee."  *Smith*, 180 F.3d at 1178; *see also* part III.B.1.b.i.2. *supra* (discussing the same proposed accommodations for Mr. Lincoln).

Like Mr. Lincoln, Mr. Mosbrucker has produced no evidence that accommodations such as sharing duties with other employees or staying within certain parts of Building 12 would leave the requirements of the shop positions substantially unmodified.  *See Smith*, 180 F.3d at 1178 (although some job restructuring may be reasonable, substantial modifications of essential job requirements are not).  Because a reasonable jury could not find that Mr. Mosbrucker was qualified, with or without reasonable accommodation, to perform the essential functions of the shop positions he sought, he has failed to establish a prima facie case of discrimination under the ADA.  These conclusions entitle BNSF to summary judgment as a matter of law.

### iii. Pretext

Even if Mr. Mosbrucker could state a prima facie case of discrimination under the ADA, BNSF is still entitled to summary judgment under the *McDonnell-Douglas* burden shifting framework because he cannot create a "genuine issue of material fact as to whether [BNSF's] reason for the adverse employment action is pretextual." *Kilcrease*, 828 F.3d at 1218. As with Mr. Lincoln, BNSF states a legitimate, nondiscriminatory reason for refusing to hire Mr. Mosbrucker. BNSF contends it did not hire Mr. Mosbrucker for the positions because he was not the best qualified for the position. Doc. 61 at 47. So, the burden shifts back to Mr. Mosbrucker to demonstrate a genuine issue of material fact whether the BNSF's reason for the adverse employment action is pretextual. *See Kilcrease*, 828 F.3d at 1218.

Mr. Mosbrucker claims he can show BNSF's stated reason is pretextual because "[BNSF] went so far as to claim that the inside of [Building 12] was somehow outside." Doc. 71 at 42. Mr. Mosbrucker also cites BNSF's failure to engage in the interactive process because "he failed to fill out a form accurately" as reasons to believe BNSF's stated reason was pretextual. Doc. 71 at 42. But none of the circumstances Mr. Mosbrucker relies on are such that a reasonable jury could find that BNSF's stated reason for not hiring Mr. Mosbrucker—that he was not the best qualified—is pretextual. The court thus grants BNSF's Motion for Summary Judgment on this issue.

### C. Plaintiffs' ADA Failure to Accommodate Claims

Plaintiffs jointly assert two arguments that BNSF violated the ADA by failing to accommodate them. Plaintiffs limit their failure to accommodate claim to BNSF's shop positions. First, plaintiffs assert that BNSF failed to accommodate them because it never placed them in shop positions at BNSF. Second, plaintiffs contend that BNSF failed to engage in the

interactive process with them trying to find a suitable accommodation for shop positions at BNSF.[10]

### 1. Failure to reassign to a vacant position

At the outset, the court notes that the parties disagree whether the Tenth Circuit's decision in *Smith v. Midland Brake, Inc.*,[11] is good law and should apply in this case. Plaintiffs rely on *Midland Brake* for the proposition that BNSF violated the ADA by failing to assign them to vacant positions and requiring, instead, that they compete for vacant jobs. Specifically, plaintiffs rely on the following passage from *Midland Brake*:

> [A]n employer *discriminates* against a qualified individual with a disability if the employer fails to offer a reasonable accommodation. If no reasonable accommodation can keep the employee in his or her existing job, then the reasonable accommodation may require reassignment to a vacant position so long as the employee is qualified for the job and it does not impose an undue burden on the employer. Anything more, such as requiring the reassigned employee to be the best qualified employee for the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history.

*Midland Brake*, 180 F.3d at 1169.

*Midland Brake* establishes that a plaintiff bringing an ADA Failure to Accommodate claim must demonstrate the ability to make a prima facie case consisting of the following:

> (1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer; (2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished; (3) The employee requested the employer reasonably to accommodate his or her disability by

---

[10] In Mr. Lincoln's brief, he apparently contends BNSF failed to accommodate him after his request for accommodation by failing to assign him to vacant shop and clerk positions. *See* Doc. 70 at 36. But Mr. Lincoln only applied for shop positions after his request for accommodation (Carman, Pipefitter, Boilermaker, and Mechanical Shop Laborer). *See id.* at 37. And this portion of Mr. Lincoln's Opposition focuses on these shop positions. *See id.* at 36–43. Mr. Mosbrucker claims BNSF failed to accommodate him for the Boilermaker and Mechanical Shop laborer positions. *See* Doc. 71 at 34–35.

[11] 180 F.3d 1154 (10th Cir. 1999).

reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate; (4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and (5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Id.* at 1179.

BNSF responds, contending that *Midland Brake* is not good law in light of the Supreme Court's decision in *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391 (2002).  In *Barnett*, the Supreme Court held that an employer's showing that a requested accommodation by assignment conflicts with seniority rules usually suffices to show that accommodation is not reasonable.  *Barnett*, 535 U.S. at 406.  The court concludes it need not decide this issue here because, even if it applies *Midland Brake* to the summary judgment facts presented here, defendant is entitled to summary judgment.  This is so because neither plaintiff has established a prima facie case under *Midland Brake*.

The fourth element of the prima facie case requires plaintiffs to establish that they were qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company and that the employee, at summary judgment, must specifically identify which vacant jobs were available within the company at or about the time the request for reassignment was made.  *Midland Brake*, 180 F.3d at 1179.  Plaintiffs try to hit this mark, asserting BNSF failed to accommodate them when it did not hire them for certain shop positions.  Specifically, Mr. Lincoln claims that BNSF failed to accommodate him when it refused to place him in the Carman, Pipefitter, Mechanical Shop Laborer, and Boilermaker positions he sought.

Mr. Mosbrucker claims that BNSF failed to accommodate him by failing to place him in the Boilermaker and Mechanical Shop Laborer positions he sought. As set out more fully above, no reasonable jury could find that plaintiffs were qualified to perform the essential functions of the shop positions because, it is uncontested, plaintiffs were restricted from working outdoors.

### 2. Failure to engage in the interactive process

Plaintiffs also assert that BNSF failed to engage in the interactive process with them, and that this failure, in and of itself, violates the ADA. The interactive process is an "essential component of the process by which a reasonable accommodation can be determined." *Midland Brake*, 180 F.3d at 1172. "The federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Id.* at 1171. Generally, the interactive process begins with an employee providing notice to the employer of "the employees' disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job." *Id. at* 1171–72. Once the employee triggers the interactive process by giving notice to the employer, "both parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company." *Id.*

Plaintiffs contend that they triggered the interactive process by sending letters to BNSF's Mr. Martin requesting accommodations, and that BNSF failed to engage with them. Plaintiffs assert that BNSF failed to consider whether, for the shop positions, "to the extent some minimal outside tasks were required, those duties could be shared with other employees." Doc. 70 at 42; *see also* Doc. 71 at 37–38. And plaintiffs contend BNSF never discussed with them whether they could work within the "heat-controlled confines" of Building 12. Doc. 70 at 42; *see also* Doc. 71 at 37.

As already discussed, BNSF has produced evidence that the ability to work outside was an essential function of the shop positions. The Tenth Circuit has held that it is not reasonable "to require an employer . . . to require a redefinition of the essential requirements of a vacant job so as to bring it within the qualification of a disabled employee." *Midland Brake*, 180 F.3d at 1178. Although some job restructuring may be reasonable, substantial modifications of essential job requirements are not. *Id.* Requiring other employees to share plaintiffs' job responsibilities in the shop positions, or limiting plaintiffs' work to the climate controlled confines of Building 12, are substantial modifications of essential job requirements—that the employee is able to work outdoors in all weather conditions. The governing law does not view plaintiffs' proposed accommodations as reasonable ones.

Also, the undisputed facts establish that BNSF engaged in the interactive process with plaintiffs for over two-and-one-half years before plaintiffs sent their letters requesting accommodation. Then, BNSF sent plaintiffs forms requiring signatures from their health-care professionals so that the interactive process could continue. Neither plaintiff returned this form with his physician's signature. When the employee fails to provide medical information necessary to the interactive process, the Tenth Circuit has held that the employee is precluded from claiming that the employer violated the ADA by failing to provide reasonable accommodation. *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998).

No reasonable jury could find that plaintiffs were qualified to perform the essential functions of the shop positions or that BNSF failed to engage in the interactive process. BNSF is thus entitled to summary judgment as a matter of law on plaintiffs' failure to accommodate claims.

### D. ADA Retaliation

Plaintiffs' last ADA theory relies on retaliation discrimination.  Both plaintiffs theorize that BNSF kept plaintiffs out of positions for which they were qualified to retaliate against them for having asserted their rights and requesting accommodations under the ADA.

The court also analyzes this retaliation claim under the *McDonnell Douglas* burden-shifting framework.  *Proctor v. United Parcel Service*, 502 F.3d 1200, 1208 (10th Cir. 2007).  In the retaliation setting, this approach uses a three-step analysis.  First, plaintiff must establish a prima facie case of retaliation.  *Id.*  If plaintiffs establish a prima facie case, the burden then shifts to the defendant, who must provide a legitimate, nondiscriminatory reason for its adverse employment decision.  *Id.*  If the employer articulates such a reason, it then becomes plaintiffs' burden to show that the defendant's proffered reason for the challenged action is pretextual.  *Id.*  For a retaliation claim under the ADA, a prima facie case consists of a showing that:  (1) the plaintiff engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action.  *Id.*

On the summary judgment facts, plaintiffs establish the first two elements of the prima facie case.  Both plaintiffs have adduced evidence that they engaged in protected activity when they requested an accommodation on October 1, 2012.[12]  Both plaintiffs contend that they suffered materially adverse employment actions when BNSF subsequently failed to hire them for shop positons.  Mr. Lincoln claims he suffered an adverse employment action when BNSF refused to hire him for the positions he applied for on November 1, 2012 (Carman, Pipefitter, and Mechanical Shop Laborer).  Mr. Mosbrucker claims he suffered an adverse employment

---

[12] Defendant contests whether plaintiffs' requests were sufficient to qualify as protected activity, but for the purpose of summary judgment, the court will assume plaintiffs' letters constituted protected activity.

action when BNSF refused to hire him for the positions he applied for in 2013 and 2014 (the only position for which he has exhausted his administrative remedies under the ADA for this time period is Mechanical Shop Laborer). The question for the court, then, is whether a reasonable jury could conclude a causal nexus exists between plaintiffs' requests for accommodation and BNSF's decision not to hire them.

To establish a causal connection between plaintiffs' letters and BNSF's failure to hire them, plaintiffs must produce "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Proctor*, 502 F.3d at 1208. Plaintiffs assert that a reasonable jury could infer such a causal connection between their requests and BNSF's failure to hire them for the same reasons articulated for pretext in their ADA discrimination claim: (1) plaintiffs initially were removed from service because of their medical conditions, (2) BNSF failed to engage them in the interactive process despite their requests to do, (3) each sustained at least one adverse employment action as a result. *See* Doc. 70 at 46–47, 49; *see also* Doc. 71 at 41–42, 44.

Mr. Lincoln contends that BNSF rejected him after the union appointed him to the Safety Assistant position. *See* Doc. 70 at 46–47; Doc. 71 at 42. Mr. Lincoln also contends that a causal nexus inference is proper because Ms. Artzer testified that he seemed "entitled" to a job at BNSF in his job interview for the Boilermaker position. Doc. 70 at 49. Mr. Mosbrucker fashions a similar theory. He claims a causal nexus inference is proper because Ms. Artzer refused to hire him for the Boilermaker position, and admitted that his interview questions about the chemical spill accident played a role in his not passing the interview. But the problem with this theory is Ms. Artzer did not testify in her deposition—as he asserts in his Opposition—that Mr. Mosbrucker's interview question about the spill played a role in his not passing the interview.

Instead, Ms. Artzer testified that she asks every interview candidate whether they "have [ ] ever been involved in work place accident." Doc. 73-5 at 7. She also testified that she does not remember what [Mr. Mosbrucker's] answers were. *See id.*

Plaintiffs have adduced no evidence from which a reasonable jury could conclude that a causal nexus exists between their request for accommodation and BNSF's decision not to hire them. The first evidence plaintiffs rely on is that they initially were removed from service because of medical conditions that, they admit, kept them from working. *See* Doc. 70 at 46–47, 49; *see also* Doc. 71 at 41–42, 44. It is unclear how this reasonably could support an inference of a causal connection between their subsequent request for accommodation and BNSF's refusal to hire them. Neither plaintiff explains. This argument is unpersuasive. Second, the undisputed facts do not demonstrate that BNSF failed to engage in the interactive process with plaintiffs. Indeed, plaintiffs interacted for two-and-one-half years with BNSF's MEH department. Third, Mr. Lincoln's not receiving the Safety Assistant position is not one of the claims for which he has exhausted his administrative remedies under the ADA. And, even if it was, Mr. Lincoln was not qualified because one of the essential functions of the position is the ability to work outside. *See* part III.B.1.b.i.1. Finally, the fact that BNSF took similar actions with respect to both plaintiffs who suffered similar medical conditions does not establish a causal nexus between plaintiffs' requests for accommodation and BNSF's decision not to hire them. As discussed above, both plaintiffs were similarly unqualified to perform the essential functions of the positions for which they applied.

No reasonable jury could find that a causal nexus exists between BNSF's request for accommodation and BNSF's failure to hire them for the shop positions. BNSF is thus entitled to judgment as a matter of law on plaintiffs' ADA retaliation claims.

And, even if plaintiffs could establish a prima facie case, BNSF is still entitled to summary judgment. If plaintiffs could establish a prima facie case, the burden merely would shift to defendant to provide a legitimate, nondiscriminatory reason for its adverse employment decision. *Proctor*, 502 F.3d at 1208. BNSF asserts it did not hire plaintiffs for the positions they sought because they were not qualified due to their restrictions from working outdoors. The burden thus shifts back to plaintiffs to show that defendant's proffered reason for the challenged action is pretextual. Both plaintiffs rely on the same evidence to establish pretext under their retaliation claims as for their discrimination claims. This evidence is equally insufficient to permit a reasonable jury to conclude that BNSF's stated reason for refusing to hire plaintiffs for the positions they sought was pretextual. *See* discussion in B.1.b.ii. and B. 2.b.iii. BNSF is thus entitled to summary judgment on plaintiffs' ADA Retaliation claims for a second, independent reason.

### E. Plaintiffs' FRSA Claims

This leaves plaintiffs' claims under the Federal Railroad Safety Act. Mr. Lincoln asserts BNSF violated the FRSA when it declined to hire him for the Safety Assistant position. Mr. Mosbrucker asserts BNSF violated the FRSA when it declined to hire him for the Mechanical Shop Laborer position.

The FRSA prohibits railroad operators from discharging, demoting, suspending, reprimanding, or discriminating in any other way against an employee who engaged in certain protected activity. 49 U.S.C. § 20109(a). Protected activity under the act includes: (1) lawfully and in good faith reporting a violation of federal law, rule, or regulation pertaining to railroad safety or security, (2) reporting hazardous safety conditions, and (3) seeking medical treatment for an on-duty injury. *See* 49 U.S.C. § 20109(a)–(b)(1)(A), and (c)(1)–(2).

Both plaintiffs assert that BNSF refused to hire them for the jobs they applied for because they sent it demand letters in 2010. Plaintiffs believe that their demand letters informed BNSF that it negligently had handled the 2007 chemical spill and, as a result, violated their rights under the Federal Employees Liability Act ("FELA"). According to plaintiffs, the demand letters thus qualified as protected activity under the FRSA.

### 1. Prima Facie FRSA Case

"To establish a violation under [the] FRSA, a complainant must show that the protected activity was a 'contributing factor' in the adverse employment action." *BNSF R.R. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 638 (10th Cir. 2016) (citing § 20109(b)(2)(B)(i)). The FRSA "incorporates by reference the rules and procedures applicable to [the] Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistle blower cases," which includes a burden shifting test. *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013). Under AIR-21's burden shifting test, a FRSA plaintiff must establish by a preponderance of the evidence that: (1) plaintiff engaged in protected activity; (2) the employer knew that plaintiff engaged in the protected activity; (3) plaintiff suffered an adverse action; and (4) the protected activity was a contributing factor to the adverse action. *Id.*

For the first element, plaintiffs assert they engaged in protected activity when they sent demand letters to BNSF's representative in 2012. The demand letters describe the chemical spill, plaintiffs' injuries, the extensive damages they suffered, and the damages their doctors anticipate in the future. *See* Doc. 73-30, Doc. 74-23. Plaintiffs contend these letters qualify as ones reporting hazardous safety conditions and/or seeking medical treatment for an on-duty injury, protected under § 20109. BNSF responds, arguing that § 20109 does not include sending a demand letter in its list of protected activities.

In *Kuduk v. BNSF Railway Company*,[13] the Eighth Circuit implied that a FRSA plaintiff must specifically identify the federal law, rule or regulation related to railroad safety to present a predicate for protected activity under § 20109. *See Kuduk*, 768 F.3d at 789 n.3 ("Neither of the incidents [plaintiff] identifies constituted protected activities under § 20109(a)(1) as [plaintiff] has not identified any Federal law, rule, or regulation related to railroad safety or security that he reasonably believed to be implicated by his complaints." (citation and internal quotation marks omitted)). Here, the court need not decide whether the demand letter qualifies as protected activity because plaintiffs have not established other elements of their prima facie case.

Part (2) of the prima facie case requires plaintiffs to show that the employer knew the plaintiffs engaged in the protected activity. Again, the parties disagree. BNSF contends neither plaintiff has adduced any evidence that the relevant decision makers for the positions Mr. Lincoln and Mr. Mosbrucker applied for knew about their demand letters. Plaintiffs, on the other hand, contend that the controlling law does not require them to show the decision makers had knowledge of the protected activity so long as they can make a showing that the "protected conduct is 'inextricably intertwined' with the protected activity." Doc. 70 at 58. Plaintiffs cite *BNSF Railway Company v. U.S. Department of Labor*, 816 F.3d 628, 638 (10th Cir. 2016) as support for this position. But the passage of *BNSF Railway* cited by plaintiffs discusses the "contributing factor" element, not the "employer knowledge" element. Their argument on this issue is unpersuasive. Plaintiffs also contend that they can show the relevant decision makers knew about their protected activity because their medical condition—and restriction from outdoor work—was identified as a reason for why plaintiffs did not get the jobs they wanted. Plaintiffs do not produce any other evidence on this element.

---

[13] 768 F.3d 786 (8th Cir. 2014)

The parties do not dispute the third element, that plaintiffs suffered an adverse employment action when BNSF refused to hire them for the positions they sought.

The last element—whether a reasonable jury could find that the plaintiffs established by a preponderance of the evidence that their demand letters were a contributing factor to BNSF's decision not to hire them for the Safety Assistant (Mr. Lincoln) and Mechanical Shop Laborer (Mr. Mosbrucker) positions—presents a difficult question. "The contributing factor standard has been understood to mean 'any factor which, alone or in conjunction with other factor, tends to affect in any way the outcome of the decision.'" *Jones v. BNSF Ry. Co.*, No. 14-2616-JAR-KGG, 2016 WL 183514, at *7 (D. Kan. Jan. 14, 2016) (quoting *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013)). Under the contributing factor standard, the employee need not "conclusively demonstrate the employer's retaliatory motive," *Jones*, 2016 WL 183514, at *7 (citing *Kuduk*, 768 F.3d at 791). Instead, the employee must prove only that the "'discriminatory animus' . . . contributed in some way to the decision." *Id.*

To establish a retaliatory motive, an employee may rely on circumstantial evidence. This includes proof like "temporal proximity, indications of pretext, inconsistent application of an employer's policies, shifting explanations by the employer, or a change in the employer's attitude towards" the employee after the employee engages in protected activity. *Jones*, 2016 WL 183514, at *7 (quoting *Loos v. BNSF Ry. Co.*, No. 13-cv-3373, 2015 WL 3970169, at *5 (D. Minn. June 30, 2015)). But temporal proximity, without more, will not present a genuine issue of fact on this element. *Jones*, 2016 WL 183514, at *7 (citing *Kuduk*, 768 F.3d at 792).

Plaintiffs here do not rely on temporal proximity, shifting explanations, inconsistent application of policies, or BNSF's shifting explanations or attitudes. Instead, they assert Dr. Clark's email to Mr. Blasdel after Dr. Clark decided to remove them from service indicates

pretext.  But, nothing in the email evidences that Dr. Clark harbored a discriminatory animus toward either plaintiff.[14]  Instead, Dr. Clark's email informs Mr. Blasdel about the information asserted in Mr. Woodfill's demand letter sent on Mr. Lincoln's behalf.  Dr. Clark wrote:

> As per our conversation today, based on the information in [Mr. Woodfill's] letter, I don't see any other avenue than to ask the employee for updated medical information to either support or deny [Mr. Woodfill's] claims regarding current functionality.
>
> . . .
>
> As [Mr. Woodfill's] letter post dates the most current medical information, [Mr. Lincoln] will need to provide updated medical information to clarify the newly raised safety issues—despite [Mr. Lincoln's] verbal claims that he can do his job.
>
> . . .
>
> I have reviewed [Mr. Lincoln's] medical file.  He completed an OSHA Respiratory Questionnaire in early 2009, and he was cleared to wear a respirator.  I will obtain[ ] a copy of the questionnaire and review it.  If [Mr. Lincoln] had mentioned RADS, shortness of breath, etc, he would not have been cleared.
>
> More later.

Doc. 73-15.  Plaintiffs also refer to another email from Dr. Clark to several other BNSF employees.  Plaintiffs rely on Dr. Clark's statement that they had "demanded a considerable sum of money" and BNSF was accusing them of using their physical ailments "in order to garner money from BNSF Claims."  Doc. 73-16 at 1.  But, it is undisputed that Dr. Clark made no hiring decisions at issue here.  And merely referencing the contents of plaintiffs' demand letter in an email explaining BNSF's decision to remove plaintiffs from service because of their medical condition does not create a triable factual issue whether the demand letter was a contributing factor for BNSF's employment decisions.

---

[14] Dr. Clark refers only to Mr. Lincoln in her email.  But plaintiffs claim the email is evidence that their demand letter was a contributing factor to the adverse employment actions suffered by both plaintiffs because they were treated the "exact same way."  Doc. 71 at 50.

In sum, plaintiffs have adduced no evidence from which a reasonable jury could conclude that their demand letters were a contributing factor to defendant's decisions not to hire them. Plaintiffs try their best to create such an issue from rhetoric, *i.e.,* "BNSF removed [them] from service [as soon as they sent their demand letters] and blacklisted [them] from that point forward, refusing to hire [them] for numerous jobs despite [their] qualifications for the same."  Doc. 71 at 51; *see also* Doc. 70 at 56.  But, the Tenth Circuit has held that the summary judgment standard does not permit a party to replace evidence with rhetoric.  "[A] plaintiff's allegations alone will not defeat summary judgment."  *Morgan*, 108 F.3d at 1324.  As in *Morgan*, plaintiffs here have adduced no "implausibilities, inconsistencies, incoherencies, or contradictions," in BNSF's cause of conduct.

Mr. Lincoln also asserts that Ms. Artzer admitted that part of the reason he was not hired for the Boilermaker job was because he did not "articulate how [he] could have prevented the [chemical spill]."  Doc. 70 at 57.  But this characterization of Ms. Artzer's testimony is fanciful. She did not testify in her deposition that the spill played a role in their not passing the interview. Instead, Ms. Artzer testified that she asks every interview candidate whether they "have [ ] ever been involved in work place accident."  Doc. 73-5 at 7.  She also testified that she does not remember how plaintiffs answered.  *See id*.  Without more, plaintiffs have not produced evidence from which a reasonable jury could conclude their demand letters were a contributing factor to BNSF's decision not to hire them.  BNSF is thus entitled to summary judgment on this issue.

### 2.  Clear and Convincing Evidence

Even if either plaintiff could establish a prima facie case under FRSA, BNSF is entitled to summary judgment for an independent reason.  BNSF has shown that it would have refused to hire plaintiffs even if they had sent no demand letters.  If plaintiffs establish a prima facie case,

the burden shifts to BNSF to show "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Araujo*, 708 F.3d at 159 (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)). BNSF has established that even if plaintiffs' demand letters had given rise to a retaliatory animus, it would not have hired either plaintiff for an independent reason. Specifically, the undisputed facts show by clear and convincing evidence that it would not have hired Mr. Lincoln or Mr. Mosbrucker because the positions they sought required the worker to be able to work outside and, it is uncontested, both plaintiffs were restricted to indoor employment.

### a. Mr. Lincoln's Claim

Starting with Mr. Lincoln's claim, the court already has determined that he exhausted his FRSA administrative remedies for just one position—his application to become a MOW Safety Assistant. *See* part III.A.2.a., *supra*. To qualify as fit for duty in this job, it is undisputed that BNSF requires candidates to possess the ability to work outdoors in all conditions. It is equally uncontroverted that BNSF's Manpower, Engineering, and Labor Relations department informed Gary Marquart—the Union General Chairman—that BNSF could not hire Mr. Lincoln because his job restrictions prohibited him from working outside. Also, undisputed is the fact that Mr. Lincoln's work restrictions never changed after March 2011. Mr. Lincoln's doctor said he could not work outside. *See* Doc. 59-17.

Unable to dispute the scope of his own medical restrictions, Mr. Lincoln, instead, attacks the premise that the ability to work outdoors properly is a requirement for the Safety Assistant's job. This attack consists of a Declaration provided by Mr. Lincoln's brother. His declaration asserts that he is employed by BNSF as a Safety Assistant and he is "rarely outside" when he works in that job. Doc. 70 at 18.

Mr. Lincoln's Opposition never addresses whether an ADA-like rubric exists to determine the essential functions of jobs at issue under a FRSA claim. The court has searched for cases addressing this question but found no authority on the subject. Given the absence of guidance, the court concludes that the Tenth Circuit likely would use an analysis similar to the one it uses in ADA cases. *See* part III.B.1.b i, *supra*. This conclusion means that the functions identified in BNSF's job description deserve considerable deference. *See Mason*, 357 F.3d at 1119 (standard "not intended to second guess the employer"); *see also Picture People, Inc.*, 684 F.3d at 997 ("employer's judgment is not conclusive evidence").

Using this analytical approach, the court concludes that no reasonable jury could find that Mr. Lincoln has established a triable issue whether a Safety Assistant must have the capacity to work outdoors. Accepting his declarant's testimony as true, the fact that one Safety Assistant "rarely" works outdoors is not the kind of showing that can create a factual issue for trial. Doc. 73-22 at 1. Indeed, even Mr. Lincoln's brother's testimony necessarily concedes that his Safety Assistant duties *sometimes* require him to work outdoors. And even if plaintiff had adduced evidence that one Safety Assistant's duties never required him to work outdoors—and he hasn't—such testimony does not mean that BNSF's Safety Assistants do not work outdoors.

As the Circuit's ADA cases recognize, more is required to create a triable issue whether the employer "ha[s] lost the evidentiary tug-of-war." *Hawkins*, 778 F.3d at 888; *see also id.* (describing the holding in *Wells* where the Circuit "deemed the plaintiff's single, self-serving affidavit woefully insufficient to overcome the employer's 'overwhelming evidence'—including a written job description and affidavits from three company supervisors" about essential functions of the disputed position).

In sum, the undisputed facts establish that Mr. Lincoln did not satisfy BNSF's requirements for applicants who aspired to work as a Safety Assistant. No reasonable jury could find a retaliatory motive contributed to BNSF's decision that: (a) Safety Assistants must have the ability to work outdoors; or (b) Mr. Lincoln lacked that ability. BNSF thus has established by clear and convincing evidence that it would have decided not to hire Mr. Lincoln for an independent reason and no reasonable jury could reach a different conclusion. This conclusion provides a second, independent reason warranting summary judgment.

### b. Mr. Mosbrucker's Claim

Turning to Mr. Mosbrucker's FRSA claim, the only position that survived the administrative exhaustion analysis is his application for the Mechanical Shop Laborer position. *See* part III.A.2.b. The summary judgment analysis for this application substantially traces the analysis that governs Mr. Lincoln's similar claim.

Assuming, without concluding, that Mr. Mosbrucker could make a prima facie case, the undisputed facts establish that he lacks the ability to meet an essential requirement of eligibility for that job. BNSF requires its Mechanical Shop Laborers to possess the ability to work outdoors. Since 2010, Mr. Mosbrucker's unchanged work restrictions have prohibited him from working outdoors.

In sum, the undisputed facts establish that Mr. Mosbrucker did not satisfy BNSF's requirements for applicants who aspired to work as a Mechanical Shop Laborers. No reasonable jury could find a retaliatory motive contributed to BNSF's decision that: (a) Mechanical Shop Laborers must have the ability to work outdoors; or (b) Mr. Mosbrucker lacked that ability. BNSF thus has established by clear and convincing evidence that it would have decided not to

hire Mr. Lincoln for an independent reason and no reasonable jury could reach a different conclusion. This conclusion warrants summary judgment on Mr. Mosbrucker's FRSA claim.

### 3. Conclusion

The court closes its FRSA analysis with an observation about the FRSA and summary judgment. In arriving at its decision to grant summary judgment against plaintiffs' claims under this act, the court is fully mindful that the purpose of the FRSA is to "promote safety in every area of railroad operations." *Araujo*, 708 F.3d at 156. Thus, the FRSA burden shifting scheme is "much more protective of plaintiff-employees than the *McDonnell Douglas* framework," requiring only that plaintiffs show their protected activity was a "contributing factor" to the employer's action. *Id.* at 158.

Despite that difference, federal courts have interpreted the statute as one permitting an employer to avoid the perplexing retaliatory motive issue. That is, federal courts have found evidence reveals that a reasonable jury could only conclude that the employer has made a clear and convincing showing warranting summary judgment under the independent reason analysis applied here. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792–93 (8th Cir. 2014) (affirming district court that defendant was not liable for wrongful retaliation because it demonstrated by "clear and convincing evidence that it would have discharged [plaintiff] even if he had not engaged in protected activity"); *Jones v. BNSF Ry. Co.*, No. 14-2616-JAR-KGG, 2016 WL 183514, at *8 (D. Kan. Jan. 14, 2016) (granting summary judgment where evidence was clear and convincing that even if defendant was motivated in part by plaintiff's protected activity, defendant would not have hired plaintiff for the position he sought because he was competing against more qualified candidates).

Here, the uncontroverted facts remain that Mr. Lincoln was restricted from working outdoors when he applied for the Safety Assistant position, and Mr. Mosbrucker was restricted from working outdoors when he applied for the Mechanical Shop Laborer position. BNSF has shown by undisputed evidence that it would have refused to hire plaintiffs for those positions for reasons unrelated to any retaliatory motive created by their demand letters. No reasonable jury could come to any other conclusion.

### F. Punitive Damages

Because the court grants BNSF's Motion for summary judgment on plaintiffs' ADA and FRSA claims, plaintiffs' claim for punitive damages is moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** BNSF's Motion for Summary Judgment against Mr. Lincoln (Doc. 58) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** BNSF's Motion for Summary Judgment against Mr. Mosbrucker (Doc. 60) is granted.

**IT IS SO ORDERED.**

**Dated this 24th day of April, 2017, at Topeka, Kansas.**


**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**