## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LARRY D. LINCOLN and** <br> **BRAD C. MOSBRUCKER,** <br><br>        **Plaintiffs,** <br><br> **v.** <br><br> **BNSF RAILWAY COMPANY,** <br><br>        **Defendant.** | **Case No. 15-4936-DDC-ADM** |

### MEMORANDUM AND ORDER

This case is before the court on remand from the Tenth Circuit Court of Appeals after it held that "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018) (also available as Doc. 98 on CM/ECF record of this case).

Based on that holding, the Circuit reversed this court's earlier "jurisdictional ruling," *id.* at 1177, and remanded the case for the court to determine whether the parties' stipulation about exhaustion waived defendant's exhaustion defense. *Id.* at 1188. The Circuit also directed the court to permit defendant to reassert arguments raised in its earlier summary judgment briefing, as they applied to certain claims. *Id.* at 1200, 1207, 1208.

This matter is before the court on defendant BNSF Railway Company's Renewed Motion for Summary Judgment (Doc. 119). Plaintiffs Larry Lincoln and Brad Mosbrucker have filed a Memorandum in Opposition (Doc. 122) and defendant has filed a Reply (Doc. 123). For the reasons explained below, the court grants BNSF's motion in part and denies it in part.

## I.      Background

Plaintiffs are two former employees of defendant BNSF Railway Company ("BNSF").

After a BNSF tank car leaked a substance near where plaintiffs were working in 2007, they

sustained injuries that required medical leave and accommodations.  Plaintiffs returned to work

and applied for several positions with BNSF that did not require significant outdoor exposure.

BNSF did not hire either plaintiff for any of these positions.  Plaintiffs then filed this lawsuit on

September 21, 2015.  Doc. 1.  They asserted employment discrimination and retaliation claims

against BNSF.  Specifically, plaintiffs made four claims:  "(1) discrimination under the

Americans with Disabilities Act ('ADA'); (2) failure to accommodate under the ADA; (3)

retaliation under the ADA; and (4) retaliation under the Federal Railroad Safety Act ('FRSA')."

*Lincoln*, 900 F.3d at 1176.

BNSF moved to dismiss the Complaint for lack of jurisdiction, arguing plaintiffs had

failed to exhaust their administrative remedies for some of their employment claims.  Docs. 8 &

9.  The parties resolved this jurisdictional dispute via stipulation.  Doc. 13.  In the stipulation, the

parties agreed plaintiffs had "exhausted their administrative remedies for employment actions

occurring on or after April 16, 2012."  *Id.* at 3.  After discovery closed, BNSF moved for

summary judgment against each plaintiff's claims.  Docs. 58 & 60.  The court concluded the

parties' stipulation could not "manufacture jurisdiction where none exists."  Doc. 86 at 19.  The

court thus granted summary judgment because, among other things, plaintiffs had failed to

exhaust their administrative remedies for certain claims.  *Id.* at 19–22.

Plaintiffs appealed.  Doc. 90.  The Tenth Circuit reversed the court's jurisdictional ruling.

Electing to bring its "precedent in line with the overwhelming majority of [its] sibling circuits,"

the Circuit held that exhausting administrative remedies is not a jurisdictional prerequisite to

filing suit in federal court. *Lincoln*, 900 F.3d at 1185–86, 1185 n.10.  The Circuit adopted a new

rule.  This new rule holds that "a plaintiff's failure to file an EEOC charge regarding a discrete

employment incident merely permits the employer to raise an affirmative defense of failure to

exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Id.* at 1185.

In the first phase of proceedings before this court, the plaintiffs, relying on four distinct

legal theories, complained about adverse decisions involving 21 job applications by Mr. Lincoln

and 22 job applications by Mr. Mosbrucker.  While the Circuit reversed the court's application of

jurisdictional precedent, it nonetheless affirmed summary judgment—on substantive grounds—

for the vast majority of plaintiffs' applications.  All in, the Circuit reversed the court's summary

judgment Order as it applied to five positions.  The Circuit remanded plaintiffs' ADA

discrimination claims for:  (a) Mr. Lincoln's Boilermaker application dated March 28, 2013; and

(b) Mr. Mosbrucker's Boilermaker application of the same date.  On the failure to accommodate

claims, the Circuit remanded claims for:  (a) Mr. Lincoln's Carman-Railcar Repair application

dated November 1, 2012; (b) Mr. Lincoln's Boilermaker application dated March 28, 2013; and

(c) Mr. Mosbrucker's Boilermaker application of the same date.  The Tenth Circuit did not

disturb the court's grant of summary judgment against all of plaintiffs' ADA retaliation claims

and their claims under the Federal Railroad Safety Act.

Also, the Circuit vacated the court's conclusion that "Mr. Mosbrucker's second EEOC

charge did not relate back to the date of his first EEOC charge" so that, "if necessary," the court

"may consider additional arguments on the issue." *Id.*  But the Circuit noted BNSF only could

"reassert arguments for summary judgment it raised in the initial summary judgment proceedings

but that the district court did not reach."[1] *Id.* at 1208.  The Circuit also directed the court to

---

[1]        The Circuit didn't impose a similar restriction on plaintiffs' arguments.

"consider what force to give the stipulation and conduct further summary judgment proceedings consistent with [its] opinion." *Id.* at 1214.

On remand, the court directed the parties to file briefs addressing enforcement of the parties' stipulation about exhaustion. Doc. 103. BNSF moved for relief from the stipulation, Doc. 104, which the court granted. Doc. 115. The court reasoned it was not bound to enforce a stipulation about a legal conclusion, and "good cause" existed to relieve BNSF from the stipulation. *Id.* at 6–8. On December 5, 2019, BNSF filed a Renewed Motion for Summary Judgment on the remanded claims. Doc. 119.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006))). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at

1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'"  *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated" in them.  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Finally, in federal court, summary judgment isn't a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.   Uncontroverted Facts

The court previously outlined some uncontroverted facts in its first summary judgment Order. Doc. 86 at 3–18. The Circuit did not reverse the court's earlier decision about uncontroverted facts. The court thus incorporates those facts by this reference. Specifically, the court adopts all of the uncontroverted facts recited on pages 3 to 18 of Doc. 86.

But, because the court had concluded it lacked jurisdiction over some of plaintiffs' claims, it did not determine whether facts about some of the positions which plaintiffs had sought were uncontroverted. *Id.* at 15, 16. Here, the court finds that additional facts relevant to the claims before it on remand are uncontroverted. The following recites those facts, finding that they either are either uncontroverted or, where controverted, they are stated in the light most favorable to plaintiffs, the non-moving parties.

### A.  The Chemical Spill and the Aftermath

Both plaintiffs were working as Maintenance of Way workers for BNSF when, on Tuesday, October 9, 2007, a tank car began to leak, exposing plaintiffs to a hazardous chemical. Plaintiffs were rushed to an emergency room where both were treated and released the same day. Plaintiffs returned to work without any restrictions six days later. Two and a half years later, BNSF offered plaintiffs a settlement for their 2007 injuries, but the parties did not reach an agreement. Plaintiffs' counsel sent demand letters to BNSF's claim representative, Alan Bladsel, which described plaintiffs' injuries in detail. The letters eventually made their way to BNSF's Medical and Environmental Health Department Field Manager for BNSF's Kansas division, Natalie Jones.

After review, BNSF determined that each plaintiff should be placed on a medical leave of absence.  As a result, BNSF removed both plaintiffs from their positions.  BNSF's representatives concluded that they needed updated medical information to determine whether plaintiffs could continue to do their jobs safely.  In a letter to each plaintiff, BNSF's Division Engineer, Darin Martin, informed them that they must "provide current medical information to [BNSF's] Medical Department to support that you are indeed safe to work . . . ."  Doc. 59-12 at 1.  Subsequent letters to plaintiffs informed them that BNSF had extended their medical leave and that plaintiffs would need to be "released by the medical department prior to returning to work."  Doc. 59-30 at 2; Doc. 61-57 at 2.

Plaintiffs tried to return to work, applying for a combined total of 43 positions at BNSF.  BNSF did not select either plaintiff for any of these jobs.

### B.  The EEOC Charges

Mr. Lincoln filed one EEOC Charge of Discrimination on February 10, 2013.  Doc. 73-40.  This charge asserted that, since BNSF removed him from service, he "continually" had applied for positions "such as Boiler Maker, Pipefitter, Carman, Laborer, Machinist and Clerical positions," but BNSF did not hire him.  *Id.*  After Mr. Lincoln filed this charge, he applied for another Boilermaker position on March 28, 2013.  Mr. Lincoln neither amended his original charge nor did he file a new charge after he submitted his March 2013 Boilermaker application.[2]

Mr. Mosbrucker filed two EEOC Charges of Discrimination, one on February 10, 2013 (Doc. 104-3 at 2) and another on May 7, 2015 (Doc. 74-38 at 2).  Like Mr. Lincoln, the February 2013 charge asserted BNSF had removed Mr. Mosbrucker from service and that he "continually"

---

[2]     Plaintiffs contend the "charge states that [Mr.] Lincoln applied for Boilermaker positions."  Doc. 122 at 3.  But plaintiffs do not controvert that Mr. Lincoln's charge was filed on February 10, 2013— about one month before he applied for this Boilermaker position.

had applied for positions "such as Boiler Maker, Pipefitter, Carman, Laborer, Machinist, Electrician, Part-Time Analyst and Clerical positions." Doc. 104-3 at 2. But, he asserted, BNSF did not award any of the positions to him. *Id.* The May 2015 charge again asserted that he "continually" had applied for "jobs such as Boiler Maker, Pipefitter, Carman, Laborer, Machinist, Electrician, Part-time Analyst and Clerical positions." Doc. 74-38 at 1. The May 2015 charge also noted that Mr. Mosbrucker applied for "Technology Services Management Trainee" and "Diesel M[a]ch[i]nist" positions in October 2014, and for "Diesel Engine Electrician, Pipefitter and Mechanical Shop Laborer" positions in November 2014. *Id.* BNSF did not place him in any of these positions. While the May 2015 charge did not explicitly note that Mr. Mosbrucker had applied for a Boilermaker position on March 28, 2013, it does assert that he previously had applied for Boilermaker positions. *Id.*

The charges filed on February 10, 2013 cover the 300 days before that filing date. In other words, the February 10, 2013 applications cover employment actions that occurred between April 16, 2012, and February 10, 2013.[3]

On September 21, 2015, plaintiffs filed this lawsuit. Doc. 1. BNSF raised the defense of exhaustion of administrative remedies in its Motion to Dismiss (Docs. 8 & 9), its Answer (Doc. 19 at 8), in the Pretrial Order (Doc. 50 at 12), and in its first Motion for Summary Judgment (Doc. 59 at 40–41; Doc. 61 at 42–44).[4]

---

[3]     Plaintiffs contend they filed "EEOC questionnaires" on January 17, 2013, which would adjust the charge coverage back to March 23, 2012. Doc. 122 at 3. Defendant "does not necessarily agree," but asserts this new date range is "immaterial." Doc. 123 at 2.

[4]     Plaintiffs challenge this fact. They contend defendant "admitted in its motion to dismiss that [Mr.] Lincoln exhausted his administrative remedies for positions post-February 10, 2013." Doc. 122 at 4. And, according to plaintiffs, "[d]efendant waived its exhaustion defense." *Id.* But these arguments ignore the court's September 23, 2019 Order relieving defendant from its exhaustion stipulation. Doc. 115 at 8. So, given this ruling, the court considers this fact uncontroverted.

### C. Plaintiffs' Qualifications

#### 1. Mr. Lincoln

Before joining BNSF, Mr. Lincoln briefly worked for a construction company and as a welder and machine operator for Met-Con Ornamental Iron.  Doc. 59-3 at 2–3 (Lincoln Dep. July 5, 2016 11:3–13:4).  At Met-Con, Mr. Lincoln did "[a] little bit of welding, cutting, grinding, and painting."  *Id.* at 3 (Lincoln Dep. July 5, 2016 13:1–4).  Mr. Lincoln joined BNSF in 2005 as a "track welder."  *Id.* (Lincoln Dep. July 5, 2016 14:6–9).  Later, Mr. Lincoln moved to a machine operator position.  Doc. 73-40 at 1.  Mr. Lincoln is a BNSF Certified Welder.  In his accommodation request, he noted that he "would need some accommodation in order to keep [his] exposure to toxins and outdoor allergens to a minimum."  Doc. 59-21 at 5.

#### 2. Mr. Mosbrucker

Mr. Mosbrucker previously worked as a welder at B&K Welding for six years before BNSF hired him.  His B&K Welding duties included "fabrication, cutting, torching, running a forklift, and running the daily business operations."  Doc. 61-3 at 2 (Mosbrucker Dep. July 6, 2016, 14:21–25).  Mr. Mosbrucker also had other welding experience at Erest-Spencer.  Mr. Mosbrucker joined BNSF as a track maintenance welder in July 2005.  Doc. 74-30 at 1.  While at BNSF, Mr. Mosbrucker held other jobs, including "maintenance welder, inspector, [and] gang/section foreman[.]"  Doc. 61-3 at 3 (Mosbrucker Dep. July 6, 2016 18:20–19:13).  Mr. Mosbrucker reported that he regularly experiences breathing problems, outbreaks of hives and shingles when he is stressed, and "the shakes."  *Id.* at 6 (Mosbrucker Dep. July 6, 2016 36:1–37:4).  He describes "the shakes" this way:  "I shake nonstop.  When I try to work on a race car, try to put a bolt in, I can't even put the bolt in the hole to line it up with the mount we're working on."  *Id.* (Mosbrucker Dep. July 6, 2016 37:5–11).

### D. Plaintiffs' Employment Applications

On remand, the Tenth Circuit directed the court to consider plaintiffs' claims based solely on their applications for two positions:  Boilermaker and Carman-Railcar Repair.  *Lincoln*, 900 F.3d at 1214.  The next two subsections—subsections 1 and 2—present the summary judgment facts about those applications.

#### 1. Boilermaker

BNSF's job posting for the Boilermaker position listed the position's requirements.  Doc. 61-43 at 1–2.  Boilermakers are "responsible for welding and operating tools and machinery to repair locomotive components."  *Id.* at 1.  The position requirements included one providing that the employee is "[a]ble to work outdoors in all weather conditions (hot, cold, rain, snow, and sleet)," "[a]ble to use hands to perform activities involving holding, grasping, turning and pulling," and "[a]ble to work in conditions that include loud noise and fumes [and] work on and around heavy and moving machinery . . . ."  *Id.* at 2.  The posting noted that BNSF provided "paid on-the-job training . . . ."  *Id.*

Both plaintiffs applied for a Boilermaker position on March 28, 2013.  Doc. 59-25 at 2; Doc. 61-33 at 4.  In her deposition, Human Resources Director Jeanne Artzer stated that neither Mr. Lincoln nor Mr. Mosbrucker passed their interview because "some of their answers to [interview] questions were not passing scores."  Doc. 59-4 at 6 (Artzer Dep. July 7, 2016 46:10–16).  Specifically, Ms. Artzer noted plaintiffs' "commitment to safety" and "trouble shooting skills" were "somewhat lacking."  *Id.* (Artzer Dep. July 7, 2016 46:17–23).  Ms. Artzer also testified that the Boilermaker position required work on the "shop floor," which "[h]as a roof" and "giant doors the size of locomotives that are always open."  *Id.* 5–6 (Artzer Dep. July 7, 2016 44:22–45:6).

### 2.   Carman-Railcar Repair

BNSF's job posting for the Topeka Carman-Railcar Repair position listed the position's requirements.  Doc. 59-35 at 2.  These requirements included one providing that the employee is "[a]ble to work outdoors in extreme all weather conditions (hot, cold, rain, snow, and sleet)" and "[a]ble to work in conditions that include loud noise and fumes . . . ."  *Id.*  The posting noted that BNSF provided "paid on-the-job" training.  *Id.* at 3.  And, it noted, the "position is responsible for inspecting, rebuilding, and repairing freight cars."  *Id.* at 1.  The posting also noted the listed duties and responsibilities "do not necessarily constitute an exhaustive list of duties for the position."  *Id.* at 4.  BNSF contends this Carman position "was for the remodeling of passenger cars" because the Topeka shop only worked on passenger cars and the freight operations relocated to Nebraska "in the early 2000s."  Doc. 123 at 4 (citing Doc. 59-4 at 10 (Artzer Dep. 67:17–68:11)).[5]  Plaintiffs don't dispute the job posting was for the Topeka location.

BNSF's HR director Jeanne Artzer testified that in Topeka, a Carman is a "skilled craftsman, either a carpenter, [or] a metal worker.  They are the ones that remodel the passenger cars and that are used for our marketing and our CEO.  Different folks like that.  These folks

---

[5]     In support of its passenger cars only proposition, BNSF also cites two cases and a *Progressive Railroading* article.  Each source reports that BNSF moved its freight operations to Nebraska around 2002.  *See Hysten v. Burlington N. Santa Fe Ry. Co.*, No. 08-2179-EFM, 2009 WL 10675644, at *3 (D. Kan. Oct. 8, 2009), *aff'd*, 415 F. App'x 897 (10th Cir. 2011) (noting "BNSF transferred all of the freight car mechanics in the Topeka facility" to Nebraska in April 2002); *Wheeler v. BNSF Ry. Co.*, 418 F. App'x 738, 740–41 (10th Cir. 2011) (noting BNSF planned to "transfer [all of] its freight car work from its Topeka facility" to Nebraska); Jeff Stagl, *BNSF to centralize rail-car repairs at Nebraska shop by April*, PROGRESSIVE RAILROADING (Jan. 21, 2002) https://www.progressiverailroading.com/rail_industry _trends/news/BNSF-to-centralize-rail-car-repairs-at-Nebraska-shop-by-April--5803.  The court doesn't rely on these sources, however.  Each source correctly may have reported conditions when it was published.  But none of the sources claims to support the state of operations in BNSF's Topeka location in 2013, when plaintiffs applied for the Carman-Railcar Repair position.  Instead the court relies on Ms. Artzer's deposition testimony that Carman-Railcar Repairmen "are the one that remodel the passenger cars . . . ."  Doc. 59-4 (Artzer Dep. July 7, 2016 67:23–68:7).

have to have a lot of remodeling, construction, carpenter type skills." Doc. 59-4 at 10 (Artzer Dep. July 7, 2016 67:17–68:7).[6]

Mr. Lincoln applied for a Carman-Railcar Repair position in Topeka, Kansas on November 1, 2012. Although Mr. Lincoln is a BNSF certified welder, BNSF did not interview him for the position. When asked why BNSF didn't interview Mr. Lincoln, Ms. Artzer testified that she didn't remember "for sure," but said "I'm guessing—well, I know he was not the best qualified." Doc. 59-4 at 10 (Artzer Dep. July 7, 2016 67:17–22). When asked whether Mr. Lincoln possessed the minimum qualifications for the Carman-Railcar Repair position in Topeka, Ms. Arzer testified he did not. *Id.* (Artzer Dep. July 7, 2016 67:23–24).

## IV.   Analysis

BNSF contends it deserves summary judgment because no genuine issues of material fact exist and it is entitled to judgment as a matter of law on each one of plaintiffs' remaining claims. First, on plaintiffs' ADA claims stemming from their March 28, 2013 Boilermaker applications, BNSF contends that plaintiffs have failed to exhaust their administrative remedies. Second, on all of plaintiffs' remaining failure to accommodate claims, BNSF contends neither plaintiff was qualified for the positions which they sought by submitting applications. Specifically, BNSF argues Mr. Lincoln was not qualified for the Carman-Railcar Repair position he applied for in November 2012. And, as an alternative argument, BNSF argues Mr. Mosbrucker was not

---

[6]     Plaintiffs argue that the Carman job description doesn't "say that the position is for a 'skilled craftsm[a]n remodeling passenger cars and required construction and carpenter skills.'" Doc. 122 at 10 (citing Doc. 73-27 (Carman-Railcar Repair Job Posting)). But, as explained below, plaintiffs' attempt to controvert with fact relies on inadmissible materials. *See* Doc. 122 at 11–12 (citing statements from Edward Arredondo, Justin Johnson, and Josh Lloyd). For reasons explained in this Order's analysis, the court concludes it can't consider these statements because they are hearsay. *See infra* Part IV.B.1. Notwithstanding this conclusion, plaintiffs never controvert the fact that the Carman-Railcar Repair job description doesn't provide "an exhaustive list" of the position's duties.

qualified for the Boilermaker position he sought in March 2013.  The court begins its analysis with the exhaustion issue, and then turns to the qualification arguments.

### A. Exhaustion

"Title I of the ADA requires a plaintiff to exhaust [his] administrative remedies before filing suit."  *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007).  Failing to exhaust administrative remedies is an affirmative defense, not a jurisdictional bar to suit.  *Lincoln*, 900 F.3d at 1185; *cf. Fort Bend Cty, Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (noting "Title VII's charge-filing requirements is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts").  But the "distinction between a jurisdictional requirement and an affirmative defense is immaterial" in a case where the defendant has "'properly presented' [the issue] for decision."  *Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (quoting *McQueen ex rel. McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 873 (10th Cir. 2007)).  The exhaustion requirement serves two principal purposes:  (1) "to give notice of the alleged violation to the charged party;" and (2) "to give the EEOC an opportunity to conciliate the claim, which effectuates Title VII's goal of securing voluntary compliance."  *Cheyenne Ret. Inv'rs*, 904 F.3d at 1164 (citations and internal quotation marks omitted).  So, to promote the purposes of the exhaustion rule, a "plaintiff's claim in court 'is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC.'"  *Id.* (quoting *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

Although courts "'liberally construe' the plaintiff's allegations in an EEOC charge, 'the *charge* must contain facts concerning the discriminatory and retaliatory actions underlying each claim[.]'"  *Id.* (quoting *Jones*, 502 F.3d at 1186).  "The ultimate question is whether the conduct

alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]." *Id.* at 1164–65 (citations and internal quotation marks omitted).

### 1. Mr. Lincoln's ADA Claims based on His March 28, 2013 Boilermaker Application

Mr. Lincoln filed his lone EEOC Charge of Discrimination on February 10, 2013. BNSF argues that Mr. Lincoln thus has failed to exhaust his administrative remedies under the ADA for his March 2013 Boilermaker application because his charge doesn't reach any adverse employment actions occurring after his lone filing on February 10, 2013.[7] Doc. 119 at 13.

Mr. Lincoln responds with two arguments. *First*, he asserts that he exhausted his administrative remedies because the EEOC investigated his March 28, 2013 Boilermaker application after BNSF produced documents about that application in response to the EEOC's subpoena. Doc. 122 at 18. *Second*, Mr. Lincoln argues that BNSF waived its exhaustion argument by not raising it before the EEOC. *Id.* at 19. The court addresses each argument, in turn, below.

### (a) Did Mr. Lincoln exhaust his administrative remedies?

Mr. Lincoln argues he exhausted his administrative remedies for his March 2013 Boilermaker application via his February 2013 Charge of Discrimination. He contends the best evidence that his March 2013 application "naturally gr[e]w" out of his February charge is that the EEOC "fully investigated" the application after BNSF provided paperwork associated with the application in its response to the EEOC. *Id.* at 18. Thus, Mr. Lincoln acknowledges that an ADA plaintiff generally must "file EEOC charges for each discrete act of alleged

---

[7]     The parties agree that Mr. Lincoln has exhausted his administrative remedies for his failure to accommodate claim based on his November 1, 2012 Carman-Railcar Repair application.

discrimination," *id.*, but urges the court to consider the unique circumstances here, *i.e.*, that BNSF fully participated in an EEOC investigation that included the March 2013 Boilermaker application, but now argues the claim wasn't fully exhausted.

In its Reply, BNSF reiterates that Mr. Lincoln's February charge couldn't have included his March 2013 Boilermaker application because that application post-dated his charge. BNSF characterizes Mr. Lincoln's argument as "a species of the discredited continuing violation doctrine" rejected by the Tenth Circuit. Doc. 123 at 9 (citing *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003)). And, because "'the reasonable and likely scope of the investigation is determined by the allegations contained in the <u>Charge</u> itself, rather than in the Charge and any responsive documents,'" BNSF argues its response to Mr. Lincoln's February 2013 charge "cannot expand the claim beyond the face of the" charge itself. *Id.* at 11–12 (quoting *Cheyenne Ret. Inv'rs*, 904 F.3d at 1165).

The court agrees with BNSF. To exhaust administrative remedies, "the charge must contain facts concerning the discriminatory . . . actions underlying each claim" because "'each discrete incident' of alleged discrimination . . . 'constitutes its own unlawful employment practice for which administrative remedies must be exhausted.'" *Jones*, 502 F.3d at 1186 (quoting *Martinez*, 347 F.3d at 1210) (further quotations omitted). When BNSF rejected Mr. Lincoln's 2013 Boilermaker application, its decision was an independent adverse employment action.[8] It required Mr. Lincoln either to amend his February 2013 charge to include

---

[8] As the Circuit noted, it is an employer's decision not to select a candidate for a position that is "the proper temporal focus of the exhaustion analysis . . . ." *Lincoln*, 900 F.3d at 1182 n.5. This is so because an individual's application for a job "is not an action taken by the employer, nor is it an adverse or unlawful employment action." *Id.* Despite the Circuit's explicit observation, the parties' post-remand summary judgment papers continue to evaluate events based on the date of the two plaintiffs' applications. *See, e.g.*, Doc. 119 at 13 (referring to Mr. Lincoln's application date for the Boilermaker position); Doc. 122 at 18 (noting plaintiffs *filed* discrimination charges in February 2013, but *applied* to Boilermaker positions in March 2013). The parties never explain why they persist in using this time

information about BNSF's decision rejecting his March 2013 Boilermaker application or file a new EEOC charge. It doesn't matter that his March 2013 Boilermaker application was similar to applications that Mr. Lincoln mentioned in the February 2013 charge because the court must look to the allegations in the charge, and not to the ensuing investigation or responsive documents to discern the scope of the claim that was administratively exhausted. *Cheyenne Ret. Inv'rs*, 904 F.3d at 1165. The court thus concludes Mr. Lincoln failed to exhaust his administrative remedies for any claims based on his March 2013 Boilermaker application.

### (b) Did BNSF waive its exhaustion argument?

Alternatively, Mr. Lincoln argues (for the first time) that BNSF waived its exhaustion argument by not raising it before the EEOC. Doc. 122 at 19. As support, he cites two cases: *Buck v. Hampton Township School District*, 452 F.3d 256 (3d Cir. 2006) and *EEOC v. JBS USA, LLC*, 794 F. Supp. 2d 1188 (D. Colo. 2011).

In *Buck*, the Third Circuit examined the employer's argument that plaintiff's claims should be dismissed because she failed to verify—*i.e.* to sign properly—her EEOC charge. *Buck*, 452 F.3d at 258. During the administrative proceedings, defendant responded to plaintiff's charge, and, participated in the EEOC investigation. *Id.* at 264. Defendant waited until plaintiff's "right to amend her charge had been cut off" before raising plaintiff's failure to verify her charge as a defense in the lawsuit. *Id.* The Third Circuit concluded that "the verification requirement is not jurisdictional, and where, as here, the employer responds to the merits of the charge without raising the plaintiff's failure to verify her charge before the EEOC, it has waived the right to assert that defense in later federal court proceedings." *Id.* at 258.

---

increment to present their arguments. But by doing so, this court, as did the Circuit, concludes that "this finer issue regarding exhaustion is both waived and forfeited." *Lincoln*, 900 F.3d at 1182 n.5.

Similarly, in *JBS USA, LLC*, defendant argued plaintiffs had failed to exhaust their administrative remedies because only their attorney had signed their EEOC charges—*i.e.*, they were unverified when submitted to the EEOC.  794 F. Supp. 2d at 1199–1200.  The federal court for the District of Colorado concluded that "the 'technical' verification requirement, like the requirement of timely filing, may be waived under certain circumstances . . . ."  *Id.* at 1202.  The Colorado court noted that the Tenth Circuit had not addressed the issue, but cited *Peterson v. City of Wichita*, 888 F.2d 1307, 1308–09 (10th Cir. 1989) as instructive.  In *Peterson*, the Tenth Circuit applied 29 C.F.R. § 1601.12(b)—an EEOC regulation allowing plaintiffs to amend unverified charges and relate them back to the original charge.  *JBS USA, LLC*, 794 F. Supp. 2d at 1200 (citing *Peterson*, 888 F.2d at 1308–09).  *Peterson* had reasoned that this regulation was consistent with the EEOC's verification requirement because "'the EEOC does not proceed to investigate a charge until it is verified.'"  *Id.* (quoting *Peterson*, 888 F.2d at 1309).  After considering *Peterson* and other authority from outside the Tenth Circuit, *JBS USA, LLC* held that the verification requirement was "technical" and waivable.  *Id.* at 1202.

Mr. Lincoln contends the court should apply "the principles from *Buck* and *JBS*" and hold that BNSF waived its exhaustion argument when it participated in the EEOC's investigation and produced Mr. Lincoln's March 2013 Boilermaker application during that investigation.  Doc. 122 at 21.  In response, BNSF argues the court should reject Mr. Lincoln's new waiver argument because "exhaustion of remedies *occurs* with the EEOC."  Doc. 123 at 12.  BNSF contends Mr. Lincoln's argument about verification has "nothing to do with the mandatory requirement of exhaustion" because an employer can't "know which claims a plaintiff will be asserting" in court until the employee files suit in court.  *Id.* at 13, 15.  At bottom, BNSF argues it "did not, and could not, waive its exhaustion defense at the EEOC stage."  *Id.* at 15.

17

The court agrees with BNSF.  Plaintiffs' argument makes little sense.  Under Mr. Lincoln's view, an employer could not invoke the exhaustion defense in a lawsuit unless the employer also had asserted the exhaustion defense during administrative proceedings before the EEOC.  But how could an employer know—*during the EEOC proceedings*—whether an employee would sue on claims that exceeded the scope of the employee's administrative charge of discrimination?  It couldn't.  And this likely explains why no court ever has embraced plaintiffs' novel view of exhaustion.

The court equally is unimpressed with plaintiffs' reliance on *Buck* and *JEB USA, LLC*. Both cases involved a requirement that applied at the administrative stage—the requirement that the charging party himself sign the charge of discrimination.  The absence of a verifying signature immediately is evident to the defending employer.  In this important sense, this requirement differs from the exhaustion requirement, because the employer can't know if a claim exceeds the scope of the administrative charge until the employee has sued in court.  Neither *Buck* nor *JEB USA, LLC* are pertinent here.

### (c) Summary

Mr. Lincoln filed just one charge of discrimination with an administrative agency.  He filed his lone charge a month before he even applied for the Boilermaker job in March 2013. And he never amended or supplemented his charge.  As a matter of law, Mr. Lincoln could not have exhausted his administrative remedies for that position because he never commenced an administrative proceeding about that employment application.  So, the court grants BNSF's Renewed Motion for Summary Judgment against Mr. Lincoln's ADA discrimination and accommodation claims based on his March 28, 2013 Boilermaker application.

**2.  Mr. Mosbrucker's Claims based on His March 28, 2013 Boilermaker Application**

Mr. Mosbrucker's exhaustion facts differ, at least in part, from Mr. Lincoln's.  Like Mr. Lincoln, Mr. Mosbrucker filed his first EEOC Charge of Discrimination on February 10, 2013.  But Mr. Mosbrucker claims he amended his charge with a new filing on May 7, 2015.  Mr. Mosbrucker's two charges preserved claims for adverse employment actions occurring within the following two periods of time:  (1) April 16, 2012 until February 10, 2013 (the 300 days before he filed his first charge on February 10, 2013); and (2) July 11, 2014 until May 7, 2015 (the 300 days before he filed his second charge on May 7, 2015).  In its renewed summary judgment motion, BNSF contends, Mr. Mosbrucker's ADA claims stemming from his Boilermaker application on March 28, 2013 are barred because he failed to exhaust his administrative remedies for claims based on an application made during neither of the two periods.[9]

For the same reasons that applied to Mr. Lincoln, Mr. Mosbrucker's February 2013 charge could not have exhausted his administrative remedies for an application he made *after* he filed that charge.  *See supra* Part IV.A.1.  The court thus considers only whether Mr. Mosbrucker's May 7, 2015 charge "related back" to his other charge filed in February 2013.

In its first summary judgment Order, the court concluded Mr. Mosbrucker's May 2015 charge didn't relate back to his February 2013 charge.  Doc. 86 at 21–22.  The Tenth Circuit directed the court, on remand, to reconsider the relation back issue "in light of" *Eisenhour v. Weber County*'s holding that "'federal courts lack jurisdiction over incidents occurring after the

---

[9]      The court again notes that the parties continue to evaluate events based on the date of Mr. Mosbrucker's application, instead of the date BNSF elected not to hire him for a position.

filing of an EEOC claim unless the plaintiff files a new EEOC claim or otherwise amends her original EEOC claim to add the new incidents.'"  *Lincoln*, 900 F.3d at 1188 n.14 (quoting *Eisenhour v. Weber Cty.*, 744 F.3d 1220, 1227 (10th Cir. 2014)).  As the Circuit explained, the jurisdictional aspect of this holding "is no longer valid in light of [its] opinion" in this case.  *Id.* But the Circuit stressed, "*Eisenhour*'s reasoning may, when considered alongside 29 C.F.R. § 1601.12(b), provide guidance on whether a second EEOC charge alleging additional discrete incidents of similar employment practices relates back to the date of an earlier charge."  *Id.*

In the post-remand summary judgment filings, Mr. Mosbrucker again argues his May 2015 charge "relates back" to his February 2013 charge.[10]  He argues that his February 2013 charge "described a pattern of discrimination, failure[] to accommodate and retaliation . . . related to [BNSF's] failure to hire him for numerous positions."  Doc. 122 at 22.  He claims the May 2015 charge "simply amplified that same pattern of conduct" and thus "relates back" to the February 2013 charge date.  *Id.* (citing 29 C.F.R. § 1601.12).  And, while Mr. Mosbrucker doesn't make an explicit argument about *Eisenhour*'s influence on his case, he makes a passing reference to the case, and contends it supports his position because he filed "'a new EEOC claim or otherwise amend[ed] [his] original EEOC claim to add the new incidents.'"  *Id.* (quoting *Eisenhour*, 744 F.3d at 1227).

---

[10]     Mr. Mosbrucker never argues that his May 2015 charge independently exhausted his March 28, 2013 Boilermaker application claims.  *See* Doc. 122 at 22.  Nor could he.  As noted above, the May 2015 charge exhausted Mr. Mosbrucker's claims for adverse employment actions between July 11, 2014 and May 7, 2015.  Mr. Mosbrucker contends he *applied* for the Boilermaker position on March 28, 2013, which is more than a year before the statutory period during which his May 2015 charge could have exhausted his claims.  But, the court notes that the parties' repeated failure to identify the date BNSF declined to hire plaintiffs, theoretically, could affect this claim.  In theory, BNSF could have declined to hire Mr. Mosbrucker for the Boilermaker position sometime after July 11, 2014.  If that were the case, then Mr. Mosbrucker's May 2015 charge could have exhausted his claims for this application. Nevertheless, such a finding isn't supported by the record.  *See* Doc. 61-43 at 1 (BNSF Job Posting for Boilermaker position, noting that the Anticipated State Date was June 3, 2013).  And, even if it were, Mr. Mosbrucker never has asserted that his May 2015 charge could have exhausted his March 2013 Boilermaker application.

Meanwhile, BNSF's post-remand filings contend that Mr. Mosbrucker's May 2015 charge is not an amendment of his February 2013 charge.  Doc. 119 at 16; Doc. 123 at 15. BNSF provides several reasons why this is so:  (1) the 2013 and 2015 charges have "different charge numbers;" (2) the 2015 charge doesn't mention the 2013 charge; (3) the 2013 charge only mentions dates in 2007 and 2010, while the 2015 charge only refers to new dates in 2014; and (4) the 2015 charge never mentions the 2013 Boilermaker application.  Doc. 119 at 16–17. BNSF also argues that *Eisenhour* comports with Supreme Court precedent and—according to BNSF—holds that "each discrete act must be separately exhausted even when acts occurring after the EEOC Charge reasonably relate to others already presented in a charge to the EEOC." Doc. 123 at 16 (citing *Eisenhour*, 744 F.3d at 1227).  Mr. Mosbrucker's May 2015 charge, BNSF contends, could not add violations "related to or growing out" the February 2013 charge's subject matter because the February 2013 charge never even mentions the March 2013 Boilermaker application.  *Id.* at 17.  And, BNSF asserts, a contrary interpretation is "inconsistent" with Supreme Court and Tenth Circuit precedent that "mak[e] [it] clear . . . a continuing violation theory is no longer valid."  *Id.*

The court agrees with BNSF's view of the governing law.  Each time BNSF declined to place Mr. Mosbrucker in a job he had applied for, it constituted a separate and discrete incident of alleged discrimination or retaliation.  *See Jones*, 502 F.3d at 1186 ("[E]ach discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted." (internal quotation marks omitted)).  Mr. Mosbrucker's original charge of discrimination couldn't have contained "subject matter" "related to or growing out of" positions for which he had not yet applied.  *See* 29 C.F.R. § 1601.12(b) ("A charge may be amended to . . . clarify and amplify allegations made therein . . . [and the]

amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first filed.").  And, the May 2015 charge cannot "clarify" an allegation never made in Mr. Mosbrucker's February 2013 charge.  To say it another way, Mr. Mosbrucker's May 2015 charge couldn't amend his February 2013 charge because the February 2013 charge couldn't have made any allegations about his March 2013 Boilermaker application—an application he wouldn't submit for another month.

Nor may Mr. Mosbrucker rely on a "continuing violation" theory.  The Supreme Court foreclosed this avenue in *Nat'l R.R. Passenger Corp. v. Morgan* when it held, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  And, as "[d]iscrete acts [such as] . . . refusal to hire are easy to identify," and "constitute[] a separate actionable 'unlawful employment practice,'" Mr. Mosbrucker's May 2015 charge only applies to "discrete discriminatory acts" occurring within the 300 days before he filed that charge on May 7, 2015.  *Id.* at 114–15.  The Tenth Circuit applied this rationale in *Martinez* and held, "*Morgan* requires a Title VII plaintiff to exhaust administrative remedies for each individual discriminatory or retaliatory act, and [thus] precludes reliance upon a continuing violation theory . . . ."  347 F.3d at 1211.  The same principle applies, of course, to an ADA claim. *Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1155–56 (10th Cir. 2004) ("Given [the] similarities [between Title VII and the ADA], this court, and many others, have used similar analyses when interpreting these two statutes.") (collecting cases).  Mr. Mosbrucker cannot circumvent the ADA's exhaustion requirements for his March 2013 Boilermaker application with a continuing violation theory.

These conclusions are consistent with *Eisenhour*.  Relying explicitly on *Martinez*, *Eisenhour* noted the plaintiff's argument that her claims were "reasonably related" to an earlier EEOC charge was no longer viable.  744 F.3d at 1226–27.  Instead, *Eisenhour* identified *Morgan*'s "new test" as one that requires a plaintiff to exhaust each discriminatory or retaliatory act separately, "even when acts that post-date the EEOC complaint reasonably relate to others presented to the EEOC."  *Id.* at 1227.  So, if a plaintiff's claim stems from an adverse "incident" occurring after he filed his EEOC charge, he must file a new EEOC claim or amend the original EEOC charge "to add the new incidents."  *Id.*

Heeding the Circuit's explicit directive, the court has considered "Mr. Mosbrucker's alternative argument that his second EEOC charge related back to the date of the first EEOC charge."  *Lincoln*, 900 F.3d at 1188 n.14.  Specifically, the court has considered Mr. Mosbrucker's relation back argument "in light of the statement in *Eisenhour*"—as modernized to omit its "lack of jurisdiction" concept—that "'incidents occurring after'" the plaintiff has filed his EEOC charge don't "relate back" to the date of the original charge unless plaintiff files a new charge or "'otherwise amends'" his original charge "'to add the new incidents.'"  *Id.* (quoting *Eisenhour*, 744 F.3d at 1227).  In the court's judgment, *Eisenhour* does not conflict with the court's earlier exhaustion conclusions.  Mr. Mosbrucker has failed to exhaust his claims based on his 2013 Boilermaker application.  He filed his February 2013 charge before he applied for the Boilermaker position in March 2013 and, thus, could not have included information about that application.  His May 2015 charge did not amend his February 2013 charge based on his March 2013 Boilermaker application because neither charge mentions that application.  And, while the May 2015 charge asserts a "continuing violation" theory, both the Supreme Court and the Circuit have held that employees cannot rely on a "continuing violation" theory to circumvent

exhaustion requirements.  *Morgan*, 536 U.S. at 110–13; *Martinez*, 347 F.3d at 1210–11.  Holding

that Mr. Mosbrucker has failed to exhaust his ADA discrimination and failure to accommodate

claims stemming from his 2013 Boilermaker application, the court grants summary judgment

against those two claims.

### B.  Failure to Accommodate

On the renewed summary judgment motion following remand, the court, in this Order,

has concluded that both Mr. Lincoln and Mr. Mosbrucker failed to exhaust their administrative

remedies for their claims—including their failure to accommodate claims—based on their

Boilermaker applications of March 28, 2013.[11]  *See* Part IV.A., *supra*.  This leaves just one claim

for consideration:  Mr. Lincoln's failure to accommodate claim based on the Carman-Railcar

Repair position, an application he submitted on November 1, 2012.  *See Lincoln*, 900 F.3d at

1207, 1214.  The court considers that claim, below.

---

[11]     BNSF alternatively argues that Mr. Mosbrucker wasn't qualified for the Boilermaker position because he "had respiratory problems (problems breathing), vision problems, skin pigmentations, broke out in shingles and hives when stressed or in the heat," and his hands shake badly.  Doc. 119 at 18–19. BNSF contends these conditions prevented Mr. Mosbrucker from welding, and from operating tools and machinery used to repair locomotives.  *Id.* at 18.  Plaintiffs argue BNSF has waived this argument, because it never raised it in the first summary judgment proceeding.  Doc. 122 at 24–25.  Because the court grants summary judgment on the exhaustion issue, the court doesn't reach BNSF's alternative argument.

Notwithstanding that decision, the court concludes that BNSF could not rely on its qualification argument here because, as plaintiffs note, BNSF never raised this argument in the first summary judgment proceedings.  *See Lincoln*, 900 F.3d at 1208 (permitting BNSF to "reassert arguments for summary judgment [on plaintiffs' failure to accommodate claims on the Boilermaker position] it raised in the initial summary judgment proceedings but that the district court did not reach."); *see also* Doc. 61 at 46 (arguing Mr. Mosbrucker wasn't qualified for "various mechanical shop jobs" because he couldn't work outdoors). In the original summary judgment papers, BNSF did mention that Mr. Mosbrucker "breaks into hives/shingles when hot and his hands shake so badly he cannot put a bolt into a hole," but only in the context of its argument that Mr. Mosbrucker was restricted from outdoor employment.  *See* Doc. 61 at 46. This reference was insufficient to present the alternative argument BNSF now presents.  And so, given the terms of the Circuit's remand to our court, the court could not grant summary judgment on this basis.

### 1. Hearsay Objections

Before the court can begin the analysis of Mr. Lincoln's remaining claim, it must decide several objections based on the Federal Rules of Evidence. These objections arise from plaintiffs' Opposition, where plaintiffs rely on statements attributed to three BNSF employees who, according to plaintiffs, worked for BNSF as Carmen. BNSF's Reply objects to the statements attributed to the BNSF Carmen, arguing (1) the court should exclude the statements as hearsay and, (2) plaintiff has failed to establish personal knowledge for the matters asserted by the statements.[12] *See* Doc. 123 at 4–5. Plaintiffs never sought leave to respond to these evidentiary objections. Below, the court concludes that it should sustain BNSF's hearsay objections and explains why. Because the court sustains these hearsay objections and thus excludes the challenged evidence, the court need not reach BNSF's personal knowledge objections.

In part (a), below, the court sets out the legal standard governing the hearsay objections at summary judgment. Next, in part (b), the court applies this standard to decide whether the statements are hearsay. Because it concludes the statements are hearsay, the court, in part (c), decides whether an exclusion from or exception to the rule against hearsay renders them admissible.

---

[12]     BNSF also contends plaintiffs' Rule 26(a) disclosures didn't include two of the declarants whose statements are at issue. So, BNSF contends, plaintiffs "could not permissibly [call the declarants to] testify directly to their alleged statements." Doc. 123 at 5. But Rule 26(a) disclosures are not filed with the court, *see* Doc. 24 at 3 (Scheduling Order) (directing parties to exchange their respective Rule 26(a) disclosures, and not file them with the court), and BNSF hasn't included plaintiffs' disclosures in its appendix of materials (or suitable supplement), as required by D. Kan. Rule 56.1(d). The court thus lacks sufficient information to decide whether BNSF's Rule 26 objection is well-taken. Also, BNSF's Rule 26 argument ignores Fed. R. Civ. P. 37(c)(1). It forbids use of an undisclosed witness "unless the failure [to disclose] was substantially justified or is harmless."

### (a) Legal Standard:  Hearsay Objections at Summary Judgment

On summary judgment, evidence need not be submitted "'in a form that would be admissible at trial,'" but the content or substance of evidence must be admissible.  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Celotex*, 477 U.S. at 324).  To be sure, parties may "submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form."  *Id.* (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005)).  "Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form."  *Id.*  And, a party can't use inadmissible hearsay to survive a summary judgment motion "because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'"  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (further internal quotation marks omitted)).

### (b) Are the challenged statements hearsay?

Plaintiffs rely on statements attributed to three BNSF employees who, according to plaintiffs, worked for BNSF as Carmen:  Edward Arredondo, II, Justin T. Johnson, and Josh Wayne Lloyd.  To simplify things, the court refers to these three individuals as the "BNSF Employees."  BNSF argues the statements of the BNSF Employees are inadmissible hearsay because they are taken from an EEOC Investigator's notes—and not from an affidavit, declaration, or other document made under penalty of perjury.  Doc. 123 at 4–5.

Close inspection of the discovery record reveals the true evidentiary character of the statements attributed to the BNSF Employees. As an example, plaintiffs' Opposition asserts that "[Mr.] Arredondo said his Carman job duties were to '[r]epair business cars, check brakes and do repairs on them.'" Doc. 122 at 11 (Pls.' Mem. in Opp'n). That's not quite right. The actual source for what plaintiffs characterize as Mr. Arredondo's statement is a "NOTE TO FILE" purportedly written by an EEOC Investigator. *See id.* (citing Doc. 122-2 at 254 ("What are your job duties? Repair business cars, check brakes and do repairs on them."). In short, plaintiffs' Opposition relies on a note prepared by one declarant—an EEOC Investigator—to prove the truth of a statement reportedly made by a second declarant—Mr. Arredondo.

Plaintiffs reuse this same methodology to offer something they characterize as Mr. Johnson's statement about his job duties at BNSF. Doc. 122 at 11. Plaintiffs contend that Mr. Johnson described his Carmen job duties as "'basically just checking to make sure the cars are legal.'" *Id.* But when one traces this alleged statement to the cited evidentiary source, one discovers that "Mr. Johnson's statement" comes from another page of notes by an EEOC Investigator. *See id.* (citing Doc. 122-2 at 257 ("What are your job duties? Justin said he checks air on the passenger cars; it is basically just air checking to make sure the cars are legal.")). The same is true for other statements that plaintiffs' Opposition attributes to Mr. Johnson: they actually come from a NOTE TO FILE written by an EEOC Investigator. *See* Doc. 122-2 at 257 ("What do you do on a day to day basis? . . . He checks 3-4 cars per day. Other than that he is a simplified lawyer. If someone has a problem they call him and he helps them out.").

The statement plaintiffs attribute to Mr. Lloyd is similar, but with one distinction. Plaintiffs take this statement from an "onsite interview" that an EEOC Investigator apparently signed. *See* Doc. 122 at 12 (citing Doc. 122-2 at 271–273). But this distinction doesn't change

the evidentiary character of the statement.  A document can qualify as an "unsworn declaration" if the author declares, "under penalty of perjury," its content "is true and correct."  28 U.S.C. § 1746(2).  But, this EEOC Investigator's "onsite interview" doesn't qualify as a declaration because the signing Investigator didn't declare he signed it under penalty of perjury.  And, more importantly, the "onsite interview" can't qualify as Mr. Lloyd's declaration because he didn't sign it.

Rule 802 of the Federal Rules of Evidence excludes hearsay evidence and Rule 801 uses a two-part standard to define the hearsay forbidden by Rule 802.  Hearsay evidence is, first, any statement made, except while testifying at the trial or hearing if, second, the party sponsoring the out-of-court statement offers it "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(1), (2).  This is precisely what plaintiffs are doing here.  They are offering statements purportedly made by three BNSF Employees during interviews conducted by EEOC Investigators outside the courtroom.  And, plaintiffs are offering those out-of-court statements to prove that the job duties of the three BNSF Employees included what they said in those statements.  In short, plaintiffs are offering the BNSF Employees' out-of-court statements to prove the truth of the what their statements assert.  The statements satisfy both parts of Rule 801(c)'s definition of hearsay.

Indeed, the statements plaintiffs offer are double hearsay—what the federal rules call "hearsay within hearsay."  Fed. R. Evid. 805.  Plaintiffs' source for the statements are "NOTE[S] TO FILE" prepared by an EEOC Investigator, in one case, or an "onsite interview" signed by an EEOC Investigator, in the other.  The NOTES and "onsite interview" (collectively, the "EEOC Notes") are "statements" made by the Investigators other than while testifying.  *See* Fed. R. Evid. 801(a) (defining "statements" under hearsay rule to include a "written assertion").  So, the

written statements are one level of hearsay.  And embedded within these written, out-of-court assertions are oral hearsay statements, *i.e.*, what BNSF Employees purportedly said during their out-of-court interactions with EEOC personnel.

The court concludes that the statements attributed to the BNSF Employees are hearsay and hearsay within hearsay.  These conclusions lead to the last layer of the analysis:  Does some other rule make these hearsay statements admissible?

### (c) Does an exclusion from or exception to the rule against hearsay apply?

Plaintiffs never address the hearsay issue.[13]  They never argue, for example, that the Federal Rules of Evidence exclude any of the statements from the definition of hearsay.  *See* Fed. R. Evid. 801(d) (identifying two kinds of statements excluded from the definition of hearsay).  Nor do plaintiffs argue that the challenged statements qualify for one of the recognized exceptions to the rule against hearsay.  *See* Fed. R. Evid. 803, 804; *see also* Fed. R. Evid. 802 (recognizing federal statutes, the Federal Rules of Evidence, or Supreme Court rules as sources for exceptions to the rule against hearsay).  Nevertheless, the court has examined the rules providing the hearsay exclusions and exceptions and determined whether any of them apply to the two levels of hearsay discussed above.

### (i) The EEOC Notes

As outlined above, the EEOC Notes are hearsay because they are statements that their authors did not make while testifying and plaintiffs now offer those statements to prove the truth of the matters asserted in the EEOC Notes.  Because it appears that the EEOC Investigator created the documents during the EEOC's investigation of plaintiffs' charges of discrimination,

---

[13]     The hearsay objection surfaced in BNSF's Reply, Doc. 123, where BNSF objected to the statements relied on by plaintiffs' Memorandum in Opposition, Doc. 122.  Plaintiffs, who had prosecuted the case with vigor and resolve, never sought leave to respond to the hearsay objection.

the court considers whether the EEOC Notes are excepted or excluded from the hearsay rule by

the "reports of regularly conducted activity" or "public records" exceptions recognized in Fed. R.

Evid. 803(6), (8).

### (A) Regularly conducted activity under Fed. R. Evid. 803(6).

The "regularly conducted activity" exception in Rule 803(6) applies to records of "an act,

event, condition, opinion, or diagnosis" if:

> (A) the record was made at or near the time by . . . someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification . . . ; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

The Fifth Circuit has decided whether an EEOC Investigator's notes qualify for this

exception. *Cruz v. Aramark Servs., Inc.*, 213 F. App'x 329, 332–33 (5th Cir. 2007). In *Cruz*,

plaintiffs offered "various letters and witness statements from the EEOC file" in their response to

a summary judgment motion. *Id.* at 332. The district court excluded this evidence because no

one had sworn to their contents. *Id.* On appeal, plaintiffs argued that the court should have

considered the statements when it decided the summary judgment motion because a different

Fifth Circuit case—*Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972), had held that

an EEOC report was admissible under Rule 803(6). *Cruz*, 213 F. App'x at 332. The Fifth

Circuit rejected this argument and affirmed the summary judgment ruling. It held "[W]hile the

EEOC report may fall within [Rule 803(6)'s] hearsay exception, the same cannot be said of the

entire EEOC file." *Id. Cruz* explained that Rule 803(6) "applies to the EEOC's report and

determination, but it does not apply to the underlying material collected during the EEOC

investigation" because that evidence independently must be admissible.  *Id.*  Plaintiffs'

evidence—letters and written statements—wasn't admissible because it consisted of "unsworn,"

"unauthenticated" statements from the EEOC investigator's notes.  *Id.* at 332–33.

*Cruz*'s holding applies with equal force here.  The EEOC Notes don't qualify for Rule

803(6)'s exception because they are "unauthenticated, [and] they are not in the form of an

affidavit" as Rule 803(6) requires.  *Id.*  Indeed, plaintiffs are trying to do precisely what the Fifth

Circuit held a party opposing summary judgment cannot do:  offer "unsworn statements in the

EEOC file" without an "affirmative indication that [the interviewed witness] swore to a

statement that was based on personal knowledge."  *Id.* at 333.  Plaintiffs haven't provided an

affidavit, declaration, or certification from the EEOC Investigators who prepared the EEOC

Notes showing Rule 803(6)'s conditions are met.

While the Tenth Circuit hasn't considered this issue, the court predicts it would adopt the

same rule as *Cruz*.  This prediction is consistent with the result in several district court opinions

following *Cruz.  See, e.g.*, *Lumar v. Monsanto Co.*, 395 F. Supp. 3d 762, 775 (E.D. La. 2019)

(relying on *Cruz*, excluding unsworn statements from EEOC's investigation file on summary

judgment motion); *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 24 (D.D.C. 2009) (excluding unsigned

EEOC notes "lacking any authentication or supporting affidavit" because Rule 803(6) doesn't

apply); *EEOC v. Sharp Mfg. Co. of Am.*, No. 06-2611, 2008 WL 189847, at *2–3 (W.D. Tenn.

Jan. 22, 2008) (relying on *Cruz* and excluding "unsigned, unsworn affidavits" because the EEOC

never authenticated them); *Wells v. XPEDX*, No. 8:05-CV-2193-T-EAJ, 2007 WL 2696566, at

*3 (M.D. Fla. Sept. 11, 2007) (excluding plaintiff's exhibit, "purportedly an EEOC investigator's

notes," because it was "unsigned, unsworn, and lacking affirmative indication of the document's

author").  Consistent with these rulings, the court concludes Rule 803(6)'s exception doesn't

apply to the EEOC Notes at issue here.

### (B) Public records under Fed. R. Evid. 803(8).

The court next considers whether the EEOC Notes qualify as "public records," as defined

in Fed. R. Evid. 803(8).  This "public record" exception applies to hearsay statements in a

document if the document sets out "(i) the office's activities; (ii) a matter observed while under a

legal duty to report . . . ; (iii) in a civil case . . . factual findings from a legally authorized

investigation;" and (iv)"the opponent does not show that the source of information or other

circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8).

Some courts, including our court, have held that a *report* issued by the EEOC—or a

similar entity—is admissible under this exception.  *McWilliams v. Ruskin Co.*, No. 04-1018-

WEB, 2006 WL 2795619, at *7 (D. Kan. Sept. 27, 2006) (noting a Kansas Human Rights

Commission report "would normally be admissible" under the public records exception to the

hearsay rule, but only "'to the extent that the maker of the document could testify to that

evidence were he present in court.'" (quoting *In re Air Crash Disaster at Stapleton Int'l. Airport,

Denver, Colo.*, 720 F. Supp. 1493, 1497 (D. Colo. 1989) (further citation omitted)); *cf. Denny v.

Hutchinson Sales Corp.*, 649 F.2d 816, 821 (10th Cir. 1981) (affirming trial court's exclusion of

Colorado Civil Rights Commission report and noting that the court must consider a public

record's trustworthiness before admitting it under Rule 803(8) and "that the trustworthiness of a

report is particularly questionable when its conclusion would not be admissible by the direct

testimony of the maker" (citation omitted)).

But almost all courts stop short of applying the public records exception to the entire

EEOC *file*.  *See, e.g.*, *Roxbury-Smellie v. Fla. Dept. of Corr.*, 324 F. App'x 783, 785 (11th Cir.

2009) (holding that the public records exception doesn't apply to co-worker statements in the EEOC file "because they were not a factual finding made by the EEOC investigator, but rather [are the] record of the interviews conducted by the EEOC investigator"); *EEOC v. Howard Univ.*, 70 F. Supp. 3d 140, 148 (D.D.C. 2014) (concluding EEOC investigator's notes offered to "cast[] doubt on defendant's contention that it was 'essential' for [their] employees to work a rotating shift" were "classic hearsay" because "they contain the out-of-court statements of third parties and are offered to prove the truth of the matter they asserted"); *McWilliams*, 2006 WL 2795619, at *7–8 (holding that out of court statements contained in KHRC investigator's notes did not qualify for hearsay exception because plaintiff didn't show the out of court statements "could be readily replaced at trial" via a "deposition, affidavit, or any other evidence to support statements allegedly made to [the investigator]"); *Stolarczyk ex rel Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 839 (N.D. Ill. 2005) ("[H]earsay statements are not exempted from the hearsay bar simply because they were related to a government officer or investigator" and while government reports generally are admissible as public records, "'portions of these reports or exhibits may present other hearsay problems'" (quoting *In Re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo.*, 720 F. Supp. at 1497)).

The Eleventh Circuit's holding in *Roxbury-Smellie* is particularly instructive on this issue. In that case, the Eleventh Circuit excluded statements by plaintiff's co-worker memorialized in an EEOC investigator's notes because "they were not a factual finding made by the EEOC investigator, but rather a record of the interviews conducted by the EEOC investigator." 324 F. App'x at 785. The court of appeals concluded that the notes were not factual findings, so the public records exception didn't apply. *Id.* Similarly, in *Stolarczyk*, the

33

court excluded an EEOC investigator's notes because the notes weren't factual findings.  376 F. Supp. 2d at 839–40.  The court relied on a decision by the District of Colorado:  *In re Air Crash Disaster*, 720 F. Supp. at 1497.  *Stolarczyk*, 376 F. Supp. 2d at 839.  In that Colorado case, the court concluded that a government report is admissible only "to the extent that the maker of the document could testify to [the] evidence." *In re Air Crash Disaster*, 720 F. Supp. at 1497. Relying in part on this guidance, the *Stolarczyk* court concluded the EEOC investigator's notes weren't admissible as a public record.  373 F. Supp. at 840.

Our court also has relied on *Air Crash Disaster*'s reasoning.  *See McWilliams*, 2006 WL 2795619, at *7–8.  In *McWilliams*, Judge Brown excluded statements in a Kansas Human Rights Commission investigator's report because the statements were hearsay.  *Id.* at *7.  *McWilliams* reasoned that the public records exception generally would allow the Commission's report, but only "'to the extent the maker of the document could testify to [the report's contents] were he present in court.'" *Id.* (quoting *In re Air Crash Disaster*, 720 F. Supp. at 1497) (further citation omitted).

The court located just one, unpublished case that extended the public records exception to an EEOC investigator's notes.  *Smith v. Warren R. Gregory & Sons, Inc.*, No. IP99-1490-C-B/S, 2001 WL 1691640, at *9 (S.D. Ind. Nov. 21, 2001) (concluding EEOC notes "fall squarely within an exception to the hearsay rule under Fed. R. Evid. 803(8)[]" because they "are the product of [the investigator's] work").  The court doesn't find *Smith* persuasive for the reasons recognized in *Roxbury-Smellie*, *Stolarczyk*, and the district court cases following them.

The court predicts that the Tenth Circuit would reach the same conclusion as *Roxbury-Smellie*, and *Stolarczyk*, and hold that the public records exception in Fed. R. Evid. 803(8) does

not apply to the EEOC Notes reporting statements by the BNSF Employees.  It thus concludes that the EEOC Notes at issue here are not admissible under Rule 803(8).

### (ii)     BNSF Employee Statements

Even if the EEOC Notes were admissible under Rule 803(6) or 803(8), plaintiffs would face a second level hearsay problem.  As explained earlier, statements recited within the EEOC records constitute hearsay within hearsay because one form of hearsay (the EEOC's NOTES TO FILE and Onsite Interview notes) reports a second form of hearsay (the oral statements attributed to the BNSF Employees).  Rule 805 permits plaintiffs to surmount these hearsay problems, but only "if each part of the combined statements conforms with an exception to the [hearsay] rule." Fed. R. Evid. 805; *see also McWilliams*, 2006 WL 2795619, at *9 ("Rule 805 mandates that each layer of hearsay be cured before admission as evidence[.]"); *Stolarczyk*, 376 F. Supp. 2d at 839 (concluding witness statements memorialized in EEOC investigator's notes were "hearsay within hearsay" and only "may be admitted . . . if there is an exception for each 'layer' of hearsay").

Perhaps recognizing their hearsay problem, plaintiffs assert that the BNSF Employees made the statements reported in the EEOC's investigative records while BNSF employed them. *See* Doc. 122 at 11 ("During its investigation, the EEOC interviewed three employees who served in the Carman position.").  Plaintiffs may have meant for this reference to solve their second level hearsay problem on the theory that the statements were made by a party opponent's agent or employee under Fed. R. Evid. 801(d)(2)(D).  If that was plaintiffs' theory, it conflicts with controlling precedent in our Circuit.

As our Circuit has explained, "'under our controlling precedent, an employee's statements are not attributable to her employer as a party-opponent admission in an employment dispute unless the employee was "involved in the decisionmaking process affecting the

employment action" at issue.'"  *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1202 (10th

Cir. 2015) (quoting *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202,1208–09 (10th Cir. 2010)); *see*

*also Alvarado v. Donley*, No. CIV 06-0807 JB/ACT, 2011 WL 13290261, at *3 n.2 (D.N.M. Jan.

25, 2011) (excluding "unsworn statements" attributed to plaintiff's co-workers by plaintiff's

deposition testimony because plaintiff offered "no evidence" that the co-worker statements

"concern[ed] a matter within the scope of the agency or employment" and noting "[i]t is not

enough to show only that a person is an employee," the statements must concern "a matter within

the scope of the agency or employment").  Plaintiffs never contend—much less establish—that

any of the quoted BNSF Employees played a role in BNSF's decision-making process.  Indeed,

plaintiffs contend the quoted employees held positions at BNSF for which plaintiffs also had

applied.  Doc. 122 at 11 ("During its investigation, the EEOC interviewed three employees who

served in the Carman position.").

    The Tenth Circuit considered an analogous situation in *Ellis*.  The plaintiff in *Ellis*

testified about an office manager's alleged statements about a company policy "*to prove that* the

Company *in fact* had such a policy."  *Ellis*, 779 F.3d at 1202.  The Circuit rejected this approach

as "classic hearsay," concluding that the statements were not excluded from the definition of

hearsay under the party-opponent exclusion in Rule 801(d)(2)(D) because the record didn't

establish that the office manager was involved in the disputed employment action.  *Id.*  The

Circuit rejected plaintiff's invitation to relax this "'more stringent standard'" and apply the

Seventh Circuit's more relaxed approach, which admits an employee's statement against the

employer if it "'match[ed] the subject matter of the employee's job description.'"  *Id.* at 1202–03

(quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003)).  Instead, our

Circuit held, even if it decided to apply the Seventh Circuit's standard, "[w]ith no record

evidence detailing the office manager's job description other than [plaintiff's] inadmissible hearsay statements," the court could not determine the statements' admissibility. *Id.* at 1203.

Here, plaintiffs have marshalled no evidence capable of supporting a finding that any of the BNSF Employees played a role in this employment dispute. *See* Fed. R. Evid. 104(b).[14]  On this summary judgment record, and under binding Circuit precedent, the court concludes that the statements of the BNSF Employees do not qualify for Rule 801(d)(2)(D)'s exclusion.

### (d) Summary

Both the EEOC Notes and the BNSF Employee statements are inadmissible hearsay.  The court can find no applicable exclusion or exception for these statements—and plaintiffs have cited none.  The court concludes it cannot consider the EEOC Notes or the BNSF Employee statements cited by plaintiffs.

### 2.  Legal Standard:  ADA failure to accommodate claim

A modified *McDonnell Douglas* burden shifting framework applies to Mr. Lincoln's ADA failure to accommodate claim.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999); *see also Lincoln*, 900 F.3d at 1204 (citing *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049–50 (10th Cir. 2017)).  This modified framework requires Mr. Lincoln to show he can make a prima facie case consisting of the following components:  "(1) [he] is disabled; (2) [he] is 'otherwise qualified' [for the position]; and (3) [he] requested a plausibly reasonable accommodation."  *Punt*, 862 F.3d at 1050 (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012)).  If plaintiff "'produces evidence sufficient to make a facial showing on . . . [his] prima facie case, the burden of production shifts to the employer to present evidence either

---

[14]     Rule 104(b) provides, in part:  "**Relevance That Depends on a Fact.**  When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exists."

(1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.'" *Id.* (quoting *Smith*, 180 F.3d at 1179); *see also Lincoln*, 900 F.3d at 1204.

A "qualified individual" with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To show he was a "qualified individual," plaintiff must establish that he had "'the requisite skill, experience, education and other job-related requirements of the employment position.'" *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (quoting 29 C.F.R. § 1630.2(m)). Also plaintiff must prove that he can perform the position's "essential functions." *Id.* If plaintiff demonstrates that he both is disabled and can perform a job's essential functions, the analysis moves to the second step. This second step requires the court to determine "'whether any reasonable accommodation [by the employer] would enable him to perform those functions.'" *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 888 (10th Cir. 2015) (quoting *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000)).

Here, if Mr. Lincoln can show he is both disabled and able to perform the Carman-Railcar Repair position's essential functions with or without accommodation, he is a "qualified individual" under § 12111(8). *Tate*, 268 F.3d at 993 (citations omitted). BNSF concedes, for summary judgment purposes, that Mr. Lincoln was disabled within the meaning of the ADA. BNSF contests the second prong of Mr. Lincoln's prima facie case, however, claiming he wasn't qualified for the Carman-Railcar Repair position because he can't show he could perform the position's essential functions. Resolving this dispute requires the court to resolve this question: What are the "essential functions" of the Carman-Railcar Repair position?

The governing law defines the essential functions of a job position as "the fundamental job duties of the employment position" and not a position's "marginal functions."  29 C.F.R. § 1630.2(n)(1); *see also Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1221 (10th Cir. 2016) ("Essential functions of a job are those that 'bear more than a marginal relationship to the job at issue.'" (quoting *Hawkins*, 778 F.3d at 887)).  To determine a position's essential functions, the court must consider "the employer's judgment . . . and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8). "Because it is the employer's role to 'describe[] the job and functions required to perform that job,' [the court] 'will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity.'"  *Kilcrease*, 828 F.3d at 1222 (quoting *Hawkins*, 778 F.3d at 888).  On this subject, relevant EEOC guidance provides:

> Evidence of whether a particular function is essential to a job includes (but is not necessarily limited to) (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Id.* (quoting *Hawkins*, 778 F.3d at 887).  "Once the employer has come forward with evidence that a job function or requirement is essential, the plaintiff bears the burden to dispute that evidence or otherwise show that the function or requirement is nonessential."  *Id.*

Still, the governing law recognizes this deference has some limits.  Our Circuit has emphasized, for instance, that the employer's judgment about a job's essential functions is not conclusive evidence.  *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003).  And, the Circuit has cautioned, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a

job description." *Id*.  The court of appeals has characterized this competition between the employer's judgment and a plaintiff's right to contest the employer's judgment about a job's essential functions as an "evidentiary tug-of-war."  *Hawkins*, 778 F.3d at 888.

The current motion requires the court to apply this rubric at the summary judgment stage to the only remaining accommodation claim, *i.e.*, Mr. Lincoln's application for the Carman-Railcar Repair position.  The court's task is to assess whether BNSF has adduced admissible evidence about job functions that it, as the employer, deems essential to that position.  If so, the court then must consider whether Mr. Lincoln has responded with admissible evidence sufficient to create a genuine dispute about the essential-ness of one or more the functions of that job.  *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (explaining that the "question of whether an employee can perform the essential functions of [his] job is a mixed question of law and fact" and concluding that a jury may need to determine the essential functions of a job in some cases, but affirming summary judgment because no reasonable jury could find for plaintiff on the essential functions question at issue there).  Part three, below, provides the court's analysis of these competing questions.

### 3.  Was Mr. Lincoln qualified for the Carman-Railcar Repair position?

On appeal, the Tenth Circuit concluded "Mr. Lincoln may have advanced sufficient evidence establishing a genuine issue of material fact that, with an accommodation, he was qualified to perform the duties of the Carman-Railcar Repair position."  *Lincoln*, 900 F.3d at 1207.  The Circuit remanded the issue to the court but noted BNSF could "reassert arguments for summary judgment it raised in the initial summary judgment proceedings but that the district court did not reach."  *Id.* at 1207.

40

Now, in its renewed summary judgment motion, BNSF offers another, independent reason Mr. Lincoln wasn't qualified for the Carman-Railcar Repair position.  BNSF contends Mr. Lincoln "lacked the basic qualifications for that position and, thus, he could not obtain it as a reasonable accommodation."  Doc. 119 at 19 (citing Doc. 59 at 23).  BNSF asserts it didn't interview Mr. Lincoln because the Carman position required a "skilled craftsman" with "construction and carpentry skills," which Mr. Lincoln lacked.  *Id.* at 20.  So, BNSF argues, because Mr. Lincoln didn't possess "the requisite skill, experience and other job-related requirements for the position, he was not a 'qualified individual' under the ADA."  *Id.* at 20–21 (citing *Tate*, 268 F.3d at 993).  Mr. Lincoln's Opposition never argues he had construction and carpentry skills.  Instead, he argues that the Carman-Railcar Repair position's job description doesn't require construction or carpentry skills.

The court assesses the parties' proffered evidence using the factors specified by 29 C.F.R § 1630.  *Hawkins*, 778 F.3d at 890.  While BNSF must "come forward with evidence concerning whether a job requirement is an essential function," Mr. Lincoln "always bears the ultimate burden of persuasion."  *Id.* at 889, 894.

On the first factor—"the employer's judgment as to which functions are essential"— BNSF relies on Ms. Artzer's deposition testimony about the function's of the Carman-Railcar Repair position.  Doc. 119 at 8 (citing Doc. 59-4 at 10 (Artzer Dep.)).  Ms. Artzer, who is BNSF's HR Director, testified:

> A carman railcar repair is not the same as repairing a railcar.  In our shop, a carman railcar repair is a skilled craftsman, either a carpenter, [or] a metal worker.  They are the ones that remodel the passenger cars and that are used for our marketing and our CEO.  Different folks like that.  These folks have to have a lot of remodeling, construction, carpenter type skills.

Doc. 59-4 at 10 (Artzer Dep. July 7, 2016 67:23–68:8).  When asked whether welding was a desired skill, Ms. Artzer answered, "Part of it is welding.  But you can't just be a welder and get a carman job.  There are other skills that are required as well."  *Id.* (Artzer Dep. July 7, 2016 68:8–11).

Mr. Lincoln doesn't controvert Mr. Artzer's testimony directly.[15]  Instead, he responds with the evidence contemplated by the second factor in the EEOC's guidance:  BNSF's written job description for the Carman-Railcar Repair position.  He argues the Carman-Railcar Repair job description doesn't require "construction and carpentry skills" and, he notes, BNSF provides "on-the-job training" for the position.  Doc. 122 at 26.  Mr. Lincoln argues the position is "one where the employee can learn on the job and through training."  *Id.*

Responding to Mr. Lincoln's argument, BNSF contends its job description describes a job in its Topeka location, where it repairs passenger railcars only.  BNSF also notes that its job description states the "duties and responsibilities in this posting are representative categories to be used in deciding whether to apply for the position.  These general categories do not necessarily constitute an exhaustive list of duties of the position."  Doc. 73-27 at 4.  BNSF argues that Mr. Lincoln cannot rebut its evidence and thus, it's undisputed that Mr. Lincoln wasn't qualified for the Carman-Railcar Repair position.

While it's a relatively close question, the court concludes Mr. Lincoln has advanced sufficient admissible evidence to create a genuine dispute about the Carman-Railcar Repair

---

[15]     In their statement of facts, plaintiffs tried to offer evidence that other Carmen perform unskilled labor or lacked carpentry skills.  Doc. 122 at 26 (contending the EEOC investigation collected evidence that other Carmen weren't established craftsmen before they got their positions).  But, as explained in detail above, these purported facts rest solely on inadmissible hearsay.  As a result, the court cannot consider that evidence or find that it creates a genuine dispute of material fact.  *See Johnson*, 594 F.3d at 1209 ("When a proper hearsay objection has been made and preserved" the court cannot consider it on summary judgment).

position's "essential functions."  BNSF's evidence relies on just one of the factors the court can consider on this issue, *i.e.*, the employer's judgment about which functions are essential.  *See* 29 C.F.R. § 1630.2(n)(3) (listing seven factors); *see also Hawkins*, 778 F.3d at 887 (listing four factors from § 1630.2(n)(3)).  In contrast, Mr. Lincoln presents evidence considered by the second factor—BNSF's written job description for the Carman-Railcar Repair position.  That job description never mentions carpentry or construction skills.  *See* Doc. 73-27 at 1–4.  While the court must give "considerable weight" to BNSF's judgment about the Carman-Railcar Repair position's essential functions, *Hawkins*, 778 F.3d at 888, BNSF's judgment is muddled.  The HR Director's testimony—given some four years after BNSF posted the position and after BNSF knew about Mr. Lincoln's failure to accommodate claim—suggests there were more, unstated requirements for the Carman-Railcar Repair position than the written job description provided.  Of course, the court "'will not second guess the employer's judgment when its description is job related, uniformly enforced, and consistent with business necessity.'"  *Kilcrease*, 828 F.3d at 1222 (quoting *Hawkins*, 778 F.3d at 888).  But here, the court isn't convinced BNSF "uniformly [has] enforced" the purported job requirements not found in its written job description.  The court equally is unconvinced by BNSF's argument that it stopped repairing freight cars in its Topeka warehouse sometime in the early 2000s.  BNSF's 2012 job description clearly provides: "This position is responsible for inspecting, rebuilding, and repairing *freight* cars."  Doc. 73-27 at 1 (emphasis added).

After considering the factors designated by EEOC guidance and the parties' argument in this "evidentiary tug-of-war," *Hawkins*, 778 F.3d at 888, the court holds that a reasonable jury could find that Mr. Lincoln was qualified to perform the essential functions of the Carman-Railcar Repair position.  To say it more particularly, a reasonable jury might find that the job's

essential functions consist of BNSF's version of those functions.  But equally true is that such a jury could find those functions consist merely of those listed by BNSF's written job description. Given this continuing and genuine dispute, summary judgment is inappropriate on this claim. The court thus denies BNSF's Renewed Motion for Summary Judgment against Mr. Lincoln's failure to accommodate claim relying on his 2012 application for the Carman-Railcar Repair position.

### V.      Conclusion

The court concludes plaintiffs failed to exhaust their administrative remedies for the following claims:  (1) plaintiffs' ADA discrimination claims relative to the Boilermaker positions to which they applied on March 28, 2013; (2) Mr. Lincoln's ADA failure to accommodate claim relative to the Boilermaker position to which he applied on March 28, 2013; and (3) Mr. Mosbrucker's failure to accommodate claim relative to the Boilermaker position to which he applied on March 28, 2013.  So, the court grants BNSF's motion for summary judgment on those claims.

But, on Mr. Lincoln's ADA failure to accommodate claim relative to the Carman-Railcar Repair position to which he applied on November 1, 2012, Mr. Lincoln has shown there is a genuine dispute whether he was qualified to perform the essential functions of the Carman-Railcar Repair position, notwithstanding his restriction from working outdoors.  The court thus denies BNSF's motion for summary judgment on Mr. Lincoln's failure to accommodate claim. This claim will proceed to trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Renewed Motion for Summary Judgment (Doc. 119) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 15th day of July, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
